Johnson, J.
The judgments of the courts below rest upon the proposition that by virtue of Section 187 of the charter of the city of Cleveland, which is set forth in the above statement, the ordinance granting to the defendant in error the right to construct its railway on the street in question is valid, notwithstanding the fact that the consents of a majority of the property owners, as represented by the foot frontage, had not been obtained as required by Sections 3777 and 9105, General Code, which were enacted prior to the adoption of Article XVIII of the Constitution in September, 1912.
It is unnecessary to refer at length to the cases which have considered the provisions of that article of the constitution known as the “Home-Rule Amendment.” They are recent and familiar.
In The State, ex rel. Toledo, v. Lynch, Auditor, 88 Ohio St., 71, it was held that the provisions of Sections 3 and 7 of Article XVIII of the Constitution, which confer upon municipalities authority to exercise all powers of local self-government and to adopt and enforce within their limits such local . police, sanitary and other similar regulations, as are not in conflict with general laws, and to frame and adopt a charter for their government, continue in force the general laws for the government of cities and villages until changed in one of three modes:
1. By the enactment of general laws for their amendment.
*482 2. By additional laws to be ratified by the electors of the municipality to be affected thereby.
3. By the adoption of a charter by the electors of a municipality in the mode pointed out in the article.
The judges who did not concur in the opinion of Shauck, J., who spoke for the court in that case, did not withhold their assent because they felt that the majority were going too far, but, as shown by the opinions they filed in the case, they thought that the majority did not go far enough, in that the judgment was that Section 3 of Article XVIII was not self-executing and that the powers granted were not as extensive as those judges believed the section conferred.
Under the constitution, previous to the amendment in 1912, municipal corporations in their public capacity possessed such powers, and such only, as were expressly granted by statute and such as might be'implied as essential to carry into effect those which were expressly granted. Ravenna v. Pennsylvania Co., 45 Ohio St., 118.
Cities and villages were created by acts of the legislature, which could confer upon them, or withdraw from them, powers at will. This authority was exercised under Article XIII, Section 6, which provides that “the general assembly shall provide for the organization of cities, and incorporated villages, by general laws, and restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent the abuse of such power.” As stated by the supreme court of the United States in Mt. Pleasant *483 v. Beckwith, 100 U. S., 514, 524: “Counties, cities, and towns are municipal corporations created by the authority of the legislature, and they derive all their powers from the source of their creation, except where the Constitution of the State otherwise provides.”
The manifest purpose of the amendment in 1912 was to alter this situation and to add to the governmental status of the municipalities. The people made a new distribution of governmental power. The charter of a city which has been adopted in conformity with the provisions of Article XVIII, and which does not disregard the limitations imposed in that article or other provisions of the constitution, finds its validity and its vitality in the constitution itself and not in the enactments of the general assembly. The source of authority and the measure of its extent is the constitution. The powers conferred by such a charter, adopted within the limitations stated, are not affected by the general statutes of the state.
As stated by Shauck, J., in The State, ex rel. Toledo, v. Lynch, Auditor, supra: “It follows that all laws in force when the latter [the new constitution] took effect, and which were .not inconsistent with it, would have remained in force without an express provision to that effect: and all inconsistent laws fell simply because they were inconsistent; in other words, all repugnant laws were repealed by implication.”
Section 7 confers on the municipality authority to adopt a charter “for its government” and “to exercise thereunder all powers of local self-goverm *484 ment.” As to the phrase “all powers of local self-government” it is said in the Lynch case, supra: “They are such powers of government as, in view of their nature and the field of their operation, are local and municipal in character.” And in Fitzgerald et al. v. City of Cleveland, 88 Ohio St., 338, 344, it is said: “It is sufficient to say here that the powers referred to are clearly such as involve the exercise of the functions of government, and they are local in the sense that they relate to the municipal affairs of the particular municipality.”
Any provision in a charter attempting to confer powers upon a municipal government in excess of the powers permitted to be granted by the constitution, or disregarding in any way the limitations imposed by that instrument, would be invalid. But it does not follow from this that a city may not by its charter confer on its government powers which are different from those conferred by general laws upon the municipal governments of the state generally.
It was contemplated by the framers of the amendment to the constitution that the provisions in a charter, adopted by a city, would differ from the general laws of the state, within the limits defined by the constitution. The object of the amendment was to permit such differences and to make them effective.
It must not be overlooked that the municipal government, as well after a charter has been adopted as before, is an arm or agency — a part — of the state. Every instrumentality established by a city or village under a home-rule charter, adopted *485 in accordance with the constitution, rests upon the grant of the state itself, which has delegated to the municipality the capacity to exercise the power. The state has given its sanction to a charter or plan of local self-government when thus adopted. There is no impermm in imperio, except in the sense that by the approval of the state the city exercises part of the sovereign power under the limitations imposed, and may thereby, subject to such limitations, exercise all powers of local self-government. This involves no lack of the harmony that is essential and no loss by the state of its proper authority over the city and its people. The charter becomes the organic law of the municipality so far as such local powers are concerned. But the authority of the state is supreme over the municipality and its citizens as to every matter and every relationship not embraced within the field of local self-government.
A fine illustration of the successful working out of the division and distribution of sovereign governmental powers is furnished by the national and state governments in the American system. The Tenth Amendment to the Constitution of the United States provides that “powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the states respectively, or to the people.”
The claim of the plaintiffs in this case is that the ownership and control of the streets for the purpose of travel is vested in the legislature as the representative of the people of the state. The contention substantially is that the control of the *486 streets is not a matter of merely local concern, but is of state-wide concern, and, therefore, not included within the power of local self-government. Many authorities are cited in Ohio and from other jurisdictions in support of the proposition that the control and regulation of the use of streets has always been exercised by the state legislature, and that the authority of municipalities to grant easements in the streets to street railway companies has been derived from the legislature. This must, of course, be conceded, because, as above shown, until the adoption of the amendment in 19Í2, cities and villages possessed only such powers as were granted to them by the general assembly.
It is well settled that a body adopting amendments, such as are here involved, will be presumed to have had in mind the legal status of and the course of legislation and existing statutes touching the subjects dealt with.
A consideration of the course of legislation in Ohio under the old constitution seems to clearly disclose that the control of streets has been regarded as a matter chiefly of municipal concern; the control to be exercised under such regulations as the legislature prescribed. It being, as shown, the source of municipal authority. •
It is said in The Hamilton, Glendale & Cincinnati Traction Co. v. Parish, 67 Ohio St., 181, 190: “In municipalities the fee of the streets is in the city or village, in trust however for street purposes. Section 2601, Revised Statutes; S. & C. 1083; Street Railway v. Cumminsville, 14 Ohio St., 523; *487 City of Columbus v. Agler, 44 Ohio St., 485; and Callen v. Electric Light Co., 66 Ohio St., 166.”
Section 3629, General Code, provides that municipalities shall have power “to lay off, establish, plat, grade, open, widen, narrow, straighten, extend, improve, keep in order and repair, light; clean and sprinkle, streets, * * * including any portion of any turnpike * * * surrendered to or condemned by the corporation,” and Section 3714, General Code, provides that the council shall have the care, supervision and control of public highways, streets, etc., within the corporation, and shall cause them to be kept open, in repair, and free from nuisance. Under the General Code, Section 3725 et seq., streets may be vacated by the city and their continued use as streets abandoned.
Many authorities are cited in briefs of counsel for defendants in error in support of the general proposition that the control of streets for public utility purposes is a matter of municipal concern.
In Sunset Telephone & Telegraph Co. v. Pasadena, 161 Cal., 265, the provisions of the California constitution, concerning the powers of local self-government in cities, which are very similar to those in Ohio, were involved. The charter gave to the city the power to grant, franchises for the laying of telephone wires, etc. The term for which any franchise could be granted .was limited to twenty years, and the full control of the use of the streets by the utilities was vested in the city. On the' other hand, the charter of the telephone company from the state gave it the ápparently unrestricted power to erect poles, etc., and to operaté *488 anywhere within the state. The city passed an ordinance providing that it would be unlawful for a telephone or telegraph company to maintain poles or wires without securing a franchise from the city. The company did not secure a franchise, and the proceeding was one to enjoin the removal of its wires. The issue in the case was whether the charter provisions, above mentioned, and the ordinance passed pursuant thereto, related to municipal affairs within the constitutional requirement. In sustaining the contention of the city the court say, at page 281: “It cannot be disputed in the light of the decisions that the state may surrender to any municipality full control of its streets and highways in regard to such matters, and, of course, an appropriate place for an enactment of this character on the part of the state is, under our constitutional provisions, the freeholders’ charter provided for by section 8, Article XI.”
In 4 McQuillen on Municipal Corporations, Section 1620, the same view is taken in a discussion of the right of a public utility to occupy the streets of a municipality.
In St. Louis v. Western Union Tel. Co., 149 U. S., 467, Justice Brewer says:
“Control over the streets resides somewhere. As the legislative power of a State is vested in the legislature, generally that body has the supreme control, and it delegates to municipal corporations such measure thereof as it deems best. The city of St. Louis occupies a unique position. It does not, like most cities, derive its powers by grant from the legislature, but it framed its own charter under *489 express authority from the people of the State, given in the constitution.”
Moreover, with reference to Ohio, the special provisions of Article XVIII itself demonstrate that the framers of that amendment, and the people in adopting it, regarded the matter under consideration here as a municipal áffair of the particular locality.
Section 4 of the “Home Rule Amendment” empowers any municipality to acquire, construct, own, lease and operate within its limits, any public utility the product or service of which is to be supplied to it, and to contract with others for such product or service.
Section 5 provides that any municipality proceeding to acquire, construct, own, lease or operate a public utility, or to contract with any person or company therefor, shall act by ordinance, and further provides for the submission of such ordinance to the electors.
Section 6 ordains that any municipality owning or operating a public utility for the purpose of supplying service or the product thereof to the muncipality or its inhabitants, may also sell and deliver .to'Others any transportation service of such utility under certain specific limitations named in. the section. .
Here ar.e explicit provisions conferring plenary power upon the municipality to deal with the subjectrmatter involved in this proceeding.
.. The. transportation service referred to comprehends and" contemplates the service of street railroads. Of course a street railroad is and .must be *490 constructed in the streets. The title which thé constitutional convention gave to this article — Municipal Corporations — and the inclusion of the provisions above set out carry the necessary implication that the powers therein conferred on the municipal governments are municipal in character and relate to the local affairs of 'the particular municipality. The authority to deal with the subject is express. It is well settled that the acceptance of an ordinance granting permission to use the streets "for the purposes of public utilities is a contract. The Cincinnati & Springfield Ry. Co. v. Village of Carthage, 36 Ohio St., 631, 634; City of Columbus v. Street Rd. Co., 45 Ohio St., 98; City of Cleveland v. Cleveland City Ry. Co., 194 U. S., 517-534.
As to the contention of the plaintiffs that the city could not be vested with the power to grant franchises, which it is insisted resides exclusively in the state, it must be noted that the scope and meaning of the term franchises must be determined by its application. It is manifest that it has a dual meaning. There is wide difference between a franchise which is incident to and inheres in the right of the corporation to exist as a corporation and the grant of a right to occupy a public street and to construct therein a public utility. The creation of the former, the artificial person, must be done by the state itself. But this is not true of the latter. As stated in Sims v. Street Rd. Co., 37 Ohio St., 556, the power to make the extension is conferred by statutes under which the company is incorporated and is acting. The ordinance granting permission to extend the track is not an act con *491 ferring corporate powers conferred by general law. Similar views are approved in The State, ex rel., v. Topeka Water Co., 61 Kans., 547, and People, ex rel., v. State Board of Tax Commrs., 174 N. Y., 417.
In considering the statute which requires the filing of consents of property owners prior.to the granting of the permission to erect a railroad in the street, it must be noted that there is no property right involved.
In The Hamilton, Glendale & Cincinnati Traction Co. v. Parish, 67 Ohio St., 181, it is held that “The consents of owners of lots abutting on a street, to the construction and operation of a street railroad on such street, 'are not property rights that can be appropriated under the power of eminent domain.”
Such consents are not property rights, but rights in their nature personal to each owner of an abutting lot.
Such personal rights were bestowed by the general assembly on owners of abutting lots as a check upon the power of the municipality. The right referred to not being a property right (the taking of which would violate the guaranties of the constitution, unless done by due process of law and after full compensation), it follows that the statute conferring it, being a matter of local concern, when inconsistent with the provisions of the charter passed under favor of the constitution, would fall simply because it was inconsistent, as' stated in the Lynch case.
*492 It is well settled that the use of a highway for the purpose of a street railway is not an additional burden on the rights of abutting property owners nor an interference in any manner with the primary use of the street. The Hamilton, Glendale & Cincinnati Trac. Co. v. Parish, 67 Ohio St., 181, 190; The Cincinnati & Spring Grove Ave. St. Ry. v. Village of Cumminsville, 14 Ohio St., 523; Railway Co. v. Telegraph Assn., 48 Ohio St., 390, 427.
In The Cincinnati & Spring Grove Ave. St. Ry. Co. v. Village of Cumminsville, supra, it is said: “The use of such a highway for the purposes of a street railroad, involves the application of new appliances and modes of travel, rather than of any new principle.”
The plaintiff must necessarily concede that the location of the street railroad on the avenue in question in this case would not be an additional burden upon the rights of abutting property owners, and the concession must be made in all cases where Sections 3777 and 9105, General Code, apply, because if the railway should constitute an additional burden on the rights of abutting property owners, or an interference in any way with their property rights, it would be hard to conceive how the constitutionality of the sections named could be sustained. It would amount to the taking of such property rights of those who refused to give consent, without due process of law and without compensation. The majority of the abutting, property owners on the street would by their act of consent destroy their neighbors’ rights.
*493 The contention of the defendant in error that Sections 3777 and 9105, General Code, known as the consents statutes, are unconstitutional, was considered in the case of Carpenter et al. v. The City of Cincinnati, decided at this term, ante, 473, in which the constitutionality of those sections was upheld.
For the reasons we have above given, the judgment will be affirmed.

Judgment affirmed.

Nichols, C. J., Donahue, Wanamaker and Matthias, JJ., concur.