CITY OF DES MOINES, Appellee, v. IOWA TELEPHONE COMPANY, Appellant.

**TELEGRAPHS AND TELEPHONES:** Establishment, Maintenance, 1 Etc.—Free Legislative Grant—Power of Municipality to Collect Rental. The fee title in trust possessed by a city in its streets, plus the statutory right in the city to "care, supervise and control" its streets, give the city no such proprietary interest in its streets as will support an action by the city to recover the reasonable rental value of that part of the streets occupied by the poles, fixtures, etc., of a telephone company which received its franchise grant, unburdened with any financial exaction, direct from an act of the state legislature.  (Sections 2158–2160, Code, 1897.)

WEAVER and PRESTON, JJ., dissent.

**STATUTES:** Construction—Expressio Unius Est Exclusio Alterius. 2 Principle recognized that the express mention of one thing implies the exclusion of another.  So held under a statute granting to telephone companies the right to occupy streets, etc., with their poles, etc., provided compensation be made to private parties injured thereby, it being held that this express mention of *private* parties excluded *public* municipalities.

**MUNICIPAL CORPORATIONS:** Streets, Etc.—Reserved Legisla- 3 tive Power.  Principle recognized that the plenary power of the general assembly over the highways of the state includes the power to arbitrarily grant to a public service corporation a *free* franchise right in the streets of a municipality.  (Section 751, Code, 1897; Art. 3, Section 30, Const.; Section 48, Par. 5, Code, 1897.)

**CONSTITUTIONAL LAW:** Impairment of Contracts—Legislative 4 Grant of Franchise in Streets.  Principle recognized that a legislative grant of a franchise in public streets may not be added to by the imposition by the municipality of additional burdens. (Art. 1, Section 21, Const.)

*Appeal from Polk District Court.*—LAWRENCE DEGRAFF, Judge.

APRIL 5, 1917.

REHEARING DENIED DECEMBER 14, 1917.

ACTION to recover rental fees for the space occupied by defendant with its poles and wires in the streets of the city of Des Moines under an ordinance passed by the city on December 30, 1912.  The petition is in five counts, and seeks to recover the sum of $1 for each pole and $1 for each mile of wire in the streets for the years 1910, 1911, 1912, 1913, and for part of the year 1914.  The defendant denied generally, and pleaded that, as successor to the Central Union Telephone Company, it acquired the right in perpetuity to maintain its wires and poles in the streets of the city free of charge.  It also pleaded a former adjudication, and an estoppel on the part of the city by its conduct and laches from maintaining this action.  It also questioned the power of the city to assess and collect rentals for the use of its streets.  On these issues, the case was submitted to the jury, on the theory that, without reference to the ordinance, the city was entitled to recover the reasonable value of the space occupied by the defendant for the years in question.  The jury returned a verdict for plaintiff in the sum of $71,658.49, and from a judgment rendered thereon, defendant appeals.—*Reversed.*

*Parker, Parrish & Miller,* for appellant.

*H. W. Byers, Guy A. Miller* and *Thos. Watters, Jr.,* for appellee.

DEEMER, J.—I.   The Central Union Telephone Company was a corporation organized under the laws of the state of Illinois, and, sometime in the year 1882, it constructed a telephone exchange in the city of Des Moines, erecting its poles, wires, and other apparatus upon the streets, alleys, and

1. TELEGRAPHS AND TELEPHONES: establishment, maintenance, etc.: free legislative grant: power of municipality to collect rental.

public places of said city. It also erected exchanges in Davenport, Keokuk, Dubuque, and other cities in the state, and constructed and used long distance lines connecting said exchanges.

About September 1, 1896, the Central Company sold to the Iowa Telephone Company, a corporation organized under the laws of this state, all its tangible property in this state, and also assigned and transferred to said company all its rights and franchises to operate its said exchanges and toll lines. After taking over the property, the Iowa Telephone Company improved and extended the same, and has maintained and used the same for the transmission of messages down until the present. Its business is both state and interstate in character. At the time this action was commenced, it had 13,991 poles and 27,385.7 miles of wire within the city of Des Moines.

On December 30, 1912, the city council of Des Moines passed an ordinance requiring every person or corporation to pay a rental fee of $1 for each and every telegraph or telephone pole used, possessed, or maintained by it upon any of the parks, streets, or alleys of the city, and $1 per mile of line owned or used by any telegraph or telephone company. This ordinance became effective January 11, 1913.

This action was brought in October of the year 1913, and the first count of the petition is based upon the ordinance just quoted. The other counts were for the reasonable rental value of the space occupied by the defendant company of the streets, alleys, and public grounds of the city with its poles, wires, etc. The trial court eliminated the ordinance, and submitted the question to the jury as to the reasonable rental value of the space occupied by defendant.

Defendant claims that it was authorized by an act of the legislature to use the streets and alleys of the city, and entitled to such use without being subject to any charge for rentals. The act upon which it relies reads as follows:

"Any person or company may construct a telegraph or telephone line along the public highways of this state, or across the rivers or over any lands belonging to the state or to any private individual, and may erect the necessary fixtures therefor; *provided,* .that when any highway along which said line has been constructed shall be changed, said person or company shall, upon ninety days' notice in writing, remove said line to said highway as established. Said notice contemplated herein may' be served on any agent or operator in the employ of said person or company. Such fixtures must not be so constructed as to incommode the public in the use of any highway or the navigation of any stream; nor shall they be set up on the private grounds of any individual without paying him a just equivalent for the damages he thereby sustains." McClain's Annotated Code, 1888, Volume 1, p. 553; Sections 1324, 1325, Code, 1873, as amended by the Acts of the Nineteenth General Assembly, Chapter 104.

This statute has not been substantially changed, and now appears as Section 2158 of the Code. The controversy turns largely upon this section, although to a complete understanding of the case it may be well to say that, on or about July 6, 1891, the city granted a franchise to the Central Union Company, whereby it reserved the use of twenty phones free of charge for city business. This ordinance also provided that:

"The rights and privileges hereby granted may at all times be subject to such ordinances or regulations of a police nature as the city council of said city may be authorized to impose and shall see fit to adopt, and said city shall have the right to attach to the top cross arm of said telephone company's poles and fixtures, its fire alarm and police wires; provided that such attachments shall be made and maintained by said city so as not to interfere with the proper use and operation of said telephone company's plant,

and said attachments shall be made under the direction of said company's local manager. And any power of the city regarding the placing of wires and fixtures underground is hereby reserved to be exercised hereafter as the city counsel may deem necessary."

On April 6, 1903, the city passed another ordinance, requiring telephone, telegraph and other wires within certain districts to be placed underground, and also regulating the erection of aerial poles outside of said district. Again, on December 30, 1912, the council passed another regulatory ordinance regarding the planting and placing of poles, the laying of conduits, the stretching of wires, and fixing the rental charge, which we have hitherto mentioned. Under this ordinance, all telephone companies were required to file with the city engineer, between the 1st days of January and April of each year, a list of all the poles and wires occupying space in the streets of the city. The defendant complied with this last provision, but has failed to pay the rentals. As already stated, the case was not tried on the theory that recovery could be had under this or any other ordinance, the sole basis of liability being predicated upon the thought that, as the city had the fee title to its streets, and power from the legislature to control the use thereof, it had the right to recover from defendant the reasonable rental value for the use of the space in the streets used and occupied by the defendant, during the five years next preceding the bringing of the action.

The defendant vigorously challenges this contention, and asserts that it and its predecessors had the right, under the legislative grant of authority, to use and occupy the streets and alleys of the city without securing the consent of the city, and without being liable to it for the use thereof. It also contends that the city had no power or authority from the legislature to impose a rental for the use of the streets with its poles and wires, and that the legislature,

having plenary power, granted to it the right to use the city streets without compensation, and required no reimbursement to anyone save owners of private property.

Again, it contends that the legislative grant, after the acceptance thereof by the defendant and its predecessors, and the investment of large sums on the strength thereof, became a grant, and that the city could not thereafter impose any other conditions or provisions upon the exercise of the power conferred. It concedes the right of the city to exercise its police power, which neither the legislature, or its creation, the municipality, could bargain away, and it also concedes that it is liable to taxation on its property under the law; but it denies the right to exact license fees, save as an exercise of the police power, and denies the right of the city, in the absence of express authority, to impose a license or tax. Having acted under a grant from the state, it denies the right of the city to take away the grant or to impose any conditions thereon, in the absence of express legislative authority, and claims that no such authority has been given, even if it were within the power of the legislature to do so.

On the other hand, the city contends that it owns its streets, alleys, and public grounds, the same as any private owner; that the legislature, by the act in question, gave nothing but a mere permissive right, which was at all times subject to such exactions as the city might see fit to impose for the use of its property, and, in the absence of any express authority from the legislature, and without any ordinance, it is entitled to recover the reasonable value of the use of its property.

While something is said regarding the reserved power of the state under its Constitution and laws, but little attention is given to this matter in argument, and that question is foreclosed by the recent decision of *State ex rel. Shaver v. Iowa Telephone Co.*, 175 Iowa 607, wherein it is

held that the additional legislation is simply regulatory in character, and was not intended to and did not apply to companies which took advantage of the section of the Code heretofore quoted.

Whilst it is broadly contended that there are statutes authorizing the city to exact a rental or a license fee for the use of the streets and alleys by telephone, telegraph, or other poles, we find no statute which expressly or by necessary implication grants this power; and, as the case was not submitted by the trial court on this theory, any further discussion of the matter is aside the mark.

Reduced to its last analysis, the proposition is this: The city owns the fee to its streets, alleys, and public places, and is entitled to compensation for the use thereof to the same extent as any private party would be under like circumstances; and without any ordinance or express grant from the legislature, it may recover compensation for this use. This, defendant denies, and it also says that, even conceding the right, the legislature, having complete and plenary power over all the streets and highways of the state, may grant the use thereof to a public utility without making any compensation to the city, and that, as it granted the right to telephone and telegraph companies, without any compensation to be paid except to private owners, it intended to and did grant the use free of charge.

2. STATUTES: construction: *expressio unius est exclusio alterius.*

It will be noticed in the first place that the act in question does provide compensation to private owners. This in itself is sufficient warrant for saying that no compensation should be paid for the use of streets and alleys for crossing the rivers, or over any of the lands belonging to the state. Again, there can be no doubt, under our previous decisions, that, under the legislative grant, the defendant and its predecessors had the unlimited right to use the public streets and alleys of the town with its poles,

wires, and apparatus, and that this right continued until revoked by the state, in the exercise of its reserved powers. See *Shaver* case, supra; *Chamberlain v. Iowa Telephone Co.*, 119 Iowa 619; *State v. Nebraska Telephone Co.*, 127 Iowa 194. It is true that none of these cases make any pronouncement upon the right of the city to exact a license or rental fee, but they do hold that the defendant had something more than a permissive right or license to use the streets and alleys of a city.

3. MUNICIPAL CORPORATIONS: streets, etc.: reserved legislative power.
It is conceded, as it must be, that a city exercises but a delegated power, and has no authority save as it is expressly conferred or necessarily implied from the powers granted; and it is further to be noticed that, under our law, the legislature may control the streets and alleys of a city. The principal (the state in this case) not only has all the powers delegated to its agent, the city, but complete and plenary powers over all matters which it may delegate to its subordinate; so that it was within the power of the legislature, if it were so disposed, to grant the use of streets and alleys in towns and cities to telephone and telegraph companies, rent free. This, we think, it did in this case.

II. Aside from this, however, while the fee title to streets and alleys in the cities and towns of this state, aside from some yet acting under special charters, is in the city, it is held by it in trust for the public. *City of Clinton v. Cedar Rapids & M. R. R. Co.*, 24 Iowa 455; *Chicago, N. & S. W. R. Co. v. Mayor of Newton*, 36 Iowa 299; *City of Council Bluffs v. Kansas City, St. J. & C. B. R. Co.*, 45 Iowa 338; *Stanley v. City of Davenport*, 54 Iowa 463; *East Boyer Telephone Co. v. Incorporated Town of Vail*, (Iowa) 129 N. W. 298. In the *City of Clinton* case, supra, this court said:

"The fee of the streets, it is conceded, is in the city, in trust for the public. By virtue of these charter provisions and this ownership of the fee, the city claims that it has the *exclusive control* of the streets, and therefore it may consent to or prohibit, as by its common council it shall deem best for the public interest, the use of its streets for railway purposes, and that the courts cannot interfere with or control the decision of the common council respecting this matter, whatever that decision may be. If these were all the provisions of the law applicable to this subject, the position of the city might, and I think would be, well taken. But there are two other statutes which have a material bearing upon this subject, and which are relied on by the defendant to support the claim which it makes of a right (subject to reasonable police and other regulations) to use such portions of the public streets of the city as are necessary to enable it to construct the road in question. The first of these statutes is, 'An act granting to railroad companies the right of way.' Rev. 218, Art. 3, passed in A. D. 1853. The other statute is the act of 1860 (Laws, 1860, p. 40), so often previously referred to in this opinion.   *   *   * The city holds the fee, but in trust for the public, not the people of the city alone, but the general public as well. To enable it to protect this trust property from invasions, to enable it the better to discharge various municipal duties proper, such as providing sewerage, digging public cisterns, laying down pipes therein, etc., and perhaps to compensate it for the burdens arising from making improvements and repairs, *the fee, the soil* of the streets, is in the corporation, but the *use* in the public.   *   *   * But if the statute of 1853 does give to railroad companies the right to occupy streets and highways longitudinally, as that opinion holds, I fail to find any such qualification of the right as makes it dependent upon 'obtaining the right of way from the *corporation* holding the fee.' As to a highway in the coun-

try, or a street in a city, where the fee is in the adjoining owner, I am not prepared to say that to lay a railroad down upon it is not an additional burden for which such proprietor is entitled to compensation. This is the doctrine of the two New York cases cited in this connection, and of subsequent decisions in the same state and elsewhere. *Wager v. Railroad Co.*, 25 N. Y. 526; *Ford v. Railroad Co.*, 14 Wis. 609. But it is a mistake to suppose that, where the fee of the streets is in the city, in trust for the public, the city is constitutionally and necessarily entitled to compensation, the same as a private proprietor holding the fee. The legislature might provide for such compensation, but is not bound to do so. It will be observed that the statement in the *Millburn* case as to the necessity of obtaining the right of way of the 'corporation holding the fee,' is because such corporation owns the fee, and, therefore, is entitled to compensation, and not because, by virtue of charter, powers, and authority, it has the right to give or refuse its consent. The constitutional provision is that 'Private property shall not be taken for public use without just compensation to the owner.' Art. 1, Sec. 18. The streets of the city are not the private property of the corporation in such a sense that the legislature cannot, so far as regards the corporation, authorize the same to be used for any public purpose for which it may see fit, unless it makes compensation to the city for such use. Since the decision in the *Millburn* case, the Court of Appeals of New York have decided this very point, in the case of the *People v. Kerr* (27 N. Y. 188). In that case, it appeared that the fee of the streets of New York City was vested in the corporation in trust for the public. It was held by the court that the city held this fee in trust for the public use of all of the people of the state, and not as the corporate property of the city.

"The legislature authorized a street railway to be laid down upon certain streets in New York City without the

consent of the city, and without providing for compensation to the city or the adjacent lot owners. The Court of Appeals, upon full consideration, decided that this might constitutionally be done, for the reason that the interest of the city in its streets was *publici juris,* and under the unqualified control of the legislature. On this point, Emott, J., said: 'The title (in the streets) thus vested in the city of New York is as directly under the power and control of the legislature, for any public purposes, as any property held directly by the state, or any public body or officers, and its application cannot be challenged by a corporation (the city) which, in respect to such property at least, is a mere agent of the sovereign power of the people.' Wright, J., said, and the court concurred therein: 'I am clearly of the opinion that the city corporation has no property in the streets of a character to be protected by the constitutional limitation on the right of eminent domain.'

"The true view is this: Municipal corporations owe their origin to, and derive their powers and rights wholly from, the legislature. It breathes into them the breath of life, without which they cannot exist. As it creates, so it may destroy. If it may destroy, it may abridge and control. Unless there is some constitutional limitation on the right, the legislature might, by a single act, if we can suppose it capable of so great a folly and so great a wrong, sweep from existence all of the municipal corporations in the state, and the *corporation* could not prevent it. We know of no limitation on this right, so far as the corporations themselves are concerned. They are, so to phrase it, the mere *tenants at will* of the legislature. This plenary power on the part of the legislature over public corporations, saving vested rights of property and of creditors, is a doctrine so well settled that it is unnecessary to refer to more than a few cases asserting it. * * * But while the corporation exists, and has been allowed to acquire

*private* property, such property is doubtless protected by the constitutional provision, the same as the private property of the citizen. The distinction is just here. A city, by its constituent act, may be authorized to acquire property for a market house, a public hall, or the like. Of this property the city cannot be deprived by legislative act, except it be taken for public use, and if so taken, the city is entitled to compensation. But its property in its public streets is not of this nature. The city cannot alien it nor use it for other than legitimate purposes. Over the use of property acquired by the exercise of the right of eminent domain, or dedicated under the statutes to public use, where the soil, the fee, passes from the dedicator, the legislature, so far as regards the rights of public corporations, possesses an unlimited control. Private citizens owning a contiguous property may have rights in or to the use and enjoyment of such public property, over which the power of the legislature is not boundless and supreme. But we are required to consider only the rights of public corporations, and these rights they hold at the absolute will and pleasure of the legislature, as the representative of the public. The pertinency of these general observations will appear in the view which will be hereafter expressed respecting the immediate question before the court.

"The English authorities cited by the counsel for the city, to the effect that the king cannot force a new charter upon a corporation, have no application in this country to the power of the legislature. The latter may incorporate a place without its consent, and without its consent add to, qualify, abridge, or even abolish, its municipal powers. The only limitation in this state on the power of the legislature is as to the *mode*. It must, in certain cases, act by general, and not by local or special laws. Const., Art. 3, Sec. 30. The state, by its legislature, must, in the nature of

things, be deemed to have control over its highways and its means of communication. It cannot be doubted that it is competent for the legislature to pass a law to the effect that any highway in the country, and any street in a city, may be used by any railroad company without the consent of the adjoining proprietors, in the case of the highway, and without the consent of the city, in the case of the street. * * * If the fee of the highway is in the adjoining owner, he may be entitled to compensation for the additional servitude to which his soil is thereby subjected. But that which gives him the right, if it exists, to compensation in such a case, is the provision of the Constitution (Art. 1, Sec. 18) protective of private property. Even in such case it remains yet to be decided in this state whether the dedication to the public, where the fee is retained, ought not to be held to cede to the legislature, as the representative of the public, the right to regulate as it sees fit the public use. Upon this point, it is not necessary for the court to express any definite opinion. But where the fee of the street is in the public, or in the city corporation in trust for the public,—for the city holds the fee not for itself or its inhabitant alone, but for the general public, equally and as well,—the legislature may authorize the street to be used by a railroad company without the consent of the city, and without compensation to the city. The reason for this has been stated: viz., that the streets of the city are not its 'private property' in such a sense as to entitle it as of right, despite legislative declaration to the contrary, to compensation for this additional public use. This point, as we have before seen, is expressly ruled in the *People v. Kerr,* above referred to, and of its correctness there can, it seems, be no doubt.

"And the decision in the *City of Des Moines v. Hall* (ante) is perfectly consistent with this view. There the city, as the holder of the legal title, of the fee, brought its

action against a private trespasser upon the soil of the street. Such an action can, of course, be maintained by the city, though its ownership of the soil is qualified, as respects the public, by the purposes for which it is held. But it is different where the city, a derivative and subordinate authority, sets up rights as against the legislature, as the sovereign representative of the general public, for whose use the streets are dedicated."

See also *State v. Davenport & St. P. R. Co.*, 47 Iowa 507; *Stange v. City of Dubuque*, 62 Iowa 303; *East Hartford v. Hartford Bridge Co.*, 10 How. (U. S.) 511. As the city holds its title in trust, and is not entitled to compensation for the use of its streets where permission or authority is granted by the legislature itself, it is clear that it is not entitled to compensation for the use of its streets.

It should also be noted that the grant in this case was to a public service corporation, and not to an individual for purely private uses, and it seems to be generally held that the location of telegraph and telephone poles upon a highway or a street within a city is not an additional servitude, of which either the public or a private individual may complain. It may be true that, if an individual without legislative authority uses or occupies the streets, alleys, or public grounds of a city for purely private purposes, he may be held liable for the use thereof, and surely he may, under our own law, be charged for the rental value. But this is not so as to a corporation engaged in public business, acting under legislative permission or grant which has never been revoked. See, as sustaining these views, *Michigan Tel. Co. v. City of Benton Harbor*, (Mich.) 80 N. W. 387; *City of Texarkana v. Southwestern Tel. & Tel. Co.*, (Texas) 106 S. W. 915. The trial court instructed:

"You are instructed that, under the statutes of this state, cities and towns have the power to authorize and regulate telephone wires and the poles and other supports there-

of by general and uniform regulation, and the court has construed the power of the plaintiff city under the authority vested in it by the state legislature to assert and charge a reasonable rental value for the use of its streets, avenues, alleys, and other public places under the control of the said city, for the space occupied by the said defendant in the use of said streets, alleys, and other public places, as shown by the testimony."

We are unable to find any statute which authorizes a city to charge a reasonable rental value for the use of its streets, avenues, alleys, etc., and none is called to our attention, save Section 775, Code, 1897, which reads in part as follows:

"Cities and towns shall have the power to authorize and regulate telegraph, district telegraph, telephone, street railway and other electric wires, and the poles and other supports thereof, by general and uniform regulation."

Assuming that this gave the power, the city has never exercised it, and, under the holding in *City of Muscatine v. Keokuk N. L. P. Co.*, 45 Iowa 185, the city not having exercized the power, the instruction quoted was erroneous.

III    The act of the legislature consti-

4. CONSTITU- tuted a grant, and this grant, as we have
TIONAL LAW:
impairment of seen, amounted to a contract, which could
contracts:
legislative not be changed except, perhaps, by the legis-
grant of fran-
chise in lature itself under its reserved power. Sure-
streets.
ly, the city could not add anything thereto. *New Orleans Gas Co. v. Louisiana Light Co.*, 115 U. S. 650; *New Orleans Waterworks Co. v. Rivers*, 115 U. S. 674; *Louisville v. Cumberland Tel. & Tel. Co.*, 224 U. S. 649; *Russell v. Sebastian*, 233 U. S. 195 (126 Pac. 875); *Owensboro v. Cumberland Telephone Co.*, 230 U. S. 58.

IV.    Counsel for appellee rely upon a line of cases of which *City of St. Louis v. Western Union Telegraph Co.*, 148 U. S. 92 (149 U. S. 465) is typical. That case differs

very essentially from the instant one. In that case it appeared that, under the organic law of Missouri, it gave to the city of St. Louis very enlarged control over public property and property deeded to public uses within territorial limits, and the telegraph company in that case received no right from the state legislature whatever. It claimed a right to occupy the streets of the city under a congressional enactment, giving it the right to construct, maintain, and operate lines of telegraph along any military or post roads of the United States, then or thereafter declared such by act of Congress; and Rev. St., Sec. 3964, declares that all letter carrier routes established in any city or town are post roads. In the *St. Louis* case, the legislature did not attempt to grant any franchise or license to the telegraph company, and it appears from the opinion that it had no authority to do so, because of the organic law of the city of St. Louis. Speaking to these points, the Supreme Court of the United States said:

"In the opinion heretofore announced, it was said: 'We do not understand it to be questioned by counsel for the defendant that, under the Constitution and laws of Missouri, the city of St. Louis has the full control of its streets in this respect and represents the public in relation thereto.' A petition for a rehearing has been filed, in which it is claimed that the court misunderstood the position of counsel; and, further, that in fact the city of St. Louis has no such control. Leave having been given therefor, briefs on the question whether such control exists have been filed by both sides, that of the telegraph company being quite full and elaborate. We see no reason to change the views expressed as to the power of the city of St. Louis in this matter. Control over the streets resides somewhere. As the legislative power of a state is vested in the legislature, generally that body has the supreme control, and it delegates to municipal corporations such measure thereof as it deems

best.   The city of St. Louis occupies a unique position.   It
does not, like most cities, derive its powers by grant from the
legislature, but it framed its own charter under express
authority from the people of the state, given in the Consti-
tution.   Sections 20 and 21 of Article 9 of the Constitution
of 1875 of the state of Missouri authorized the election of
thirteen freeholders to prepare a charter to be submitted
to the qualified voters of the city, which, when ratified by
them, was to 'become the organic law of the city.'   Section
22 provided for amendments, to be made at intervals of not
less than two years, and upon the approval of three fifths
of the voters.   Sections 23 and 25 required the charter and
amendments to always be in harmony with and subject to
the Constitution and laws of Missouri, and gave to the gen-
eral assembly the same power over this city, notwithstand-
ing the provisions of this article, as was had over other
cities.   In pursuance of these provisions of the Constitution,
a charter was prepared and adopted, and is, therefore, the
'organic law' of the city of St. Louis, and the powers grant-
ed by it, so far as they are in harmony with the Constitu-
tion and laws of the state, and have not been set aside by
any act of the general assembly, are the powers vested in
the city.   And this charter is an organic act, so defined in
the Constitution, and is to be construed as organic acts are
construed.   The city is in a very just sense an *'imperium in
imperio.'*   Its powers are self-appointed, and the reserved
control existing in the general assembly does not take away
this peculiar feature of its charter.   *   *   *   Obviously,
the intent and scope of this charter are to vest in the city
a very enlarged control over public property and property
devoted to public uses within the territorial limits.   It is
given power to open and establish streets, to improve them
as it sees fit, and to regulate their use, paying for all this
out of its own funds.   The word 'regulate' is one of broad
import.   It is the word used in the Federal Constitution to

define the power of Congress over foreign and interstate commerce, and he who reads the many opinions of this court will perceive how broad and comprehensive it has been held to be. If the city gives a right to the use of the streets or public grounds, as it did by ordinance No. 11,604, it simply regulates the use when it prescribes the terms and conditions upon which they shall be used. If it should see fit to construct an expensive boulevard in the city, and then limit the use to vehicles of a certain kind, or exact a toll from all who use it, would that be other than a regulation of use? And so it is only a matter of regulation of use when the city grants to the telegraph company the right to use exclusively a portion of the street, on condition of contributing something toward the expense it has been to in opening and improving the street. Unless, therefore, the telegraph company has some superior right which excludes it from subjection to this control on the part of the city over the streets, it would seem that the power to require payment of some reasonable sum for the exclusive use of a portion of the streets was within the grant of power to regulate the use. That the company gets no such right from the general government is shown by the opinion heretofore delivered, nor has it any such from the state.   *   *   *   Neither have we found in the various decisions of the courts of Missouri, to which our attention has been called, any denial of the power of the city in this respect." *St. Louis v. Western Union Telegraph Co.*, 149 U. S. 465, at 467.

Again, in the same case, the court said:

"And, first, with reference to the ruling that this charge was a privilege or license tax. To determine this question, we must refer to the language of the ordinance itself, and by that we find that the charge is imposed for the privilege of using the streets, alleys, and public places, and is graduated by the amount of such use. Clearly, this is no privilege or license tax. The amount to be paid is not gradu-

ated by the amount of the business, nor is it a sum fixed for the privilege of doing business. It is more in the nature of a charge for the use of property belonging to the city— that which may properly be called rental. 'A tax is a demand of sovereignty; a toll is a demand of proprietorship.' * * * We do not understand it to be questioned by counsel for the defendant that, under the Constitution and laws of Missouri, the city of St. Louis has the control of its streets, and in this respect represents the public in relation thereto. * * *

"It is a misconception, however, to suppose that the franchise or privilege granted by the act of 1866 carries with it the unrestricted right to appropriate the public property of a state. 'It is like any other franchise, to be exercised in subordination to public as to private rights. While a grant from one government may supersede and abridge franchises and rights held at the will of its grantor, it cannot abridge any property rights of a public character created by the authority of another sovereignty. No one would suppose that a franchise from the Federal government to a corporation, state or national, to construct interstate roads or lines of travel, transportation or communication, would authorize it to enter upon the private property of an individual, and appropriate it without compensation. No matter how broad and comprehensive might be the terms in which the franchise was granted, it would be confessedly subordinate to the right of the individual not to be deprived of his property without just compensation. And the principle is the same when, under the grant of a franchise from the national government, a corporation assumes to enter upon the property of a public nature belonging to a state. It would not be claimed, for instance, that, under a franchise from Congress to construct and operate an interstate railroad, the grantee thereof could enter upon the statehouse grounds of the state, and construct its depot

there, without paying the value of the property thus appro-
priated.   Although the statehouse grounds be property de-
voted to public uses, it is property devoted to the public
uses of the state, and property whose ownership and con-
trol are in the state, and it is not within the competency
of the national government to dispossess the state of such
control and use, or appropriate the same to its own benefit,
or the benefit of any of its corporations or grantees, with-
out suitable compensation to the state.   This rule extends
to streets and highways: they are the public property of
the state.   While for purposes of travel and common use
they are open to the citizens of every state alike, and no
state can by its legislation deprive the citizens of another
state of such common use, yet, when an appropriation of
any part of this public property to an exclusive use is
sought, whether by a citizen or corporation of the same or
another state, or a corporation of the national government,
it is within the competency of the state, representing the
sovereignty of that local public, to exact for its benefit
compensation for this exclusive appropriation.   It matters
not for what that exclusive appropriation is taken, whether
for steam railroads or street railroads, telegraphs or tele-
phones, the state may, if it chooses, exact from the party or
corporation given such exclusive use pecuniary compensa-
tion to the general public for being deprived of the common
use of the portion thus appropriated." *St. Louis v. West-
ern Union Telegraph Co.,* 148 U. S. 92, 97.

It is very clear that the general government could not
grant to a public utility the right to use the property of a
state or other municipality or of an individual without com-
pensation.   The grant was nothing more than a license or
permissive right to use the post roads; but, as the govern-
ment had no title to or control over streets, alleys, or pub-
lic grounds of a city, it could not make any grant thereof
which would be of any validity.   In the case at bar, the

grant was directly by the legislature, which, as we have seen, had plenary power over the streets and alleys of any and all the cities and towns in the state. It is well in this connection to note that it was finally held that no recovery could be had from the telegraph company for the use of the streets, for the reason that the company was occupying these streets under a prior grant from the city itself, which made no provision for rentals; and no such charge could be made without a violation of the terms of that grant. See *City of St. Louis v. Western Union Tel. Co.*, 63 Fed. 68. *Western Union Tel. Co. v. City of Richmond*, 224 U. S. 160, also relied upon by appellee, is like the *St. Louis* case, in that the telegraph company was there relying upon the same act of Congress. It was also assumed in the *Richmond* case that the city had the same power as in the *St. Louis* case. There was no legislative grant in the *Richmond* case.

That a grant from a city, or the legislature itself, when accepted and acted upon by a telegraph or telephone company, is a contract, and that this contract is entitled to protection, is affirmed by the Supreme Court of the United States in *Boise Artesian Hot and Cold Water Co. v. Boise City*, 230 U. S. 84; *City of Springfield v. Postal Telegraph-Cable Co.*, (Ill.) 97 N. E. 672. In the latter case, the Postal Company had no franchise either from the state or city, and the state statute provided that no telegraph or telephone company should have the right to occupy the streets of a city without the consent of the municipal authorities. In these circumstances, it was held that the city had power to exact a pole rental as a condition precedent to the right to occupy its streets. In *Southwestern Tel. & Tel. Co. v. City of Dallas*, (Texas) 174 S. W. 636, the telephone company had no grant either from the state or city, and the state Constitution prohibited the city from granting such franchises; and it was held that a telephone company occupying the streets of the city without authority was a mere

licensee, and that the city might require payment of a charge as a condition precedent to its right to remain in and on the streets. The case nearest in point of any relied upon by appellee is the *City of Memphis v. Postal Telegraph-Cable Co.,* 145 Fed. 602, from the circuit court of appeals for the western district of Tennessee. In that case, there was a legislative grant; but the court, in construing it, held that, in view of prior statutes giving to the city of Memphis entire control of its streets, the grant was subject to this control, and that the city might, notwithstanding the grant, collect a pole and wire rental tax. Speaking to this point, the court said:

"It is seen by the act of 1879 'the entire control' of the streets was granted by the legislature to the city of Memphis. And we think that, for reasons hereafter noted, this grant of power included the power to demand and receive compensation for facilities afforded for a use and occupation not enjoyed by the general public. But it is claimed by the defendant that this grant of authority was superseded and rendered null, so far as telegraph and telephone companies are concerned, by the act of 1885, p. 120, c. 66, the first section of which provides that any such company 'may construct, operate and maintain such telegraph, telephone, or other lines necessary for the speedy transmission of intelligence along and over the public highways and streets of the cities and towns of this state, or across and under the waters and over any lands or public works belonging to this state.' Our attention is called to the fact that in the prior statute (Milliken & V. Code, Sec. 1535), relating to the same subject, such companies were granted this privilege 'free of charge' as expressed therein, while in the act of 1885 these words were omitted. It is contended by the city that the legislature, by the act of 1885, which is a general statute, did not intend to resume the power of

control of its streets which it had given to the city of Memphis by the act of 1869–70, and that the general law operates only as a permission to exercise in the streets of Memphis the franchises granted to telegraph companies subject to the control which it had already granted to the city. We think that this contention should be sustained, first, upon the ground of the familiar rule of construction that a statute general in its terms will not repeal by implication a particular statute relating to some particular matter or locality, unless the intention of the legislature to repeal the special act shall plainly appear. We had occasion to consider this subject with special attention in *Guthrie v. Sparks*, 131 Fed. 443 (65 C. C. A. 427). * * *

"In Sutherland on Statutory Construction (2d Ed.) Sec. 275, it is said that: 'Unless there is a plain indication of an intent that the general act shall repeal the other, it will continue to have effect, and the general words with which it conflicts will be restrained and modified accordingly.' This statement has a peculiar adaptation to the case before us. Again, there are certain special reasons for thinking that the legislature could not have intended to displace the 'entire control' of the streets which it had committed to the city. No one doubts, we suppose, that the power to charge a telegraph company with a proportion of the cost of making and keeping in repair and policing a street of the city was lodged somewhere. And if so, no place was so appropriate for lodging it as in the city itself. It alone was obliged to bear the whole cost of maintenance. The share of the cost of maintenance for public use belonged to the city. The share due from the telegraph company for its special use was also due to the city, for the latter was carrying it, and its treasury should be reimbursed. It was a local matter, and could be most conveniently attended to by the officials of the municipality who would be best informed of the circumstances, and, by all analogies, the proper persons to

assess and collect the charge.    It would belong to no other
public fund.    It was, therefore, perfectly reasonable that the
city should possess the authority to make and collect such a
charge, and rather unreasonable that it should be committed
to any other depositary of governmental authority.    And
there is no machinery provided by statute for the levy and
collection of such charges by the state, and there was none
when the legislature passed the act of 1885.    These seem to
us strong reasons for believing that the legislature had no
intention of reserving to the state the power to charge the
telegraph company for its proportion of the cost of maintain-
ing the streets of the city of Memphis, but rather that it in-
tended to leave that matter with the authority to which it
had granted the power of control possessed by the state.    The
grant of 'entire control' seems even a more absolute delega-
tion of power than the power 'to regulate,' which was held, in
*St. Louis v. Western Union Tel. Co.*, 148 U. S. 92 (13 Sup.
Ct. 485, 37 L. Ed. 380), and 149 U. S. 465 (13 Sup. Ct. 990,
37 L. Ed. 810), to authorize the city of St. Louis to assess
and collect a like charge for the use of the streets for the
maintenance of the structures of a telegraph company.    In-
deed, that case, if we are right in thinking that the Tennessee
Act of 1885 did not deprive the city of the control of its
streets in this regard, is ample authority for holding that
it had power to levy and collect the charges in question, the
reasonableness of them not being now disputed; and the
case of *Postal Telegraph Co. v. Baltimore*, 79 Md. 502 (29
Atl. 819, 24 L. R. A. 161), affirmed by the Supreme Court
of the United States in 156 U. S. 210 (15 Sup. Ct. 356, 39
L. Ed. 399), is directly in point.

"It is argued that this charge is a tax, and that the
city of Memphis is not empowered to levy a tax not speci-
fied in its charter.    But although such charges as these are
sometimes called 'taxes,' they are not such as are generally
meant in constitutions and statutes by that term.    But by

whatever name called, the power to impose them was given to the city by the grant of 'entire control' over its streets. If there is a burden imposed upon abutting owners by the structures of the telegraph company, that is a matter between those parties, and is irrelevant to the subject of the present controversy.  *  *  *

"The fifth ground of demurrer is that the charge sought to be collected is 'in violation of the Constitution of Tennessee and of the United States.' But what provision of either of those instruments this charge infringed is not pointed out, and we are unable to apprehend what it may be, unless it is that a supposed contract was created between the state and the telegraph company by the Act of 1885 and the action of the telegraph company thereunder, which is impaired by the city of Memphis in imposing this charge. But, for the reasons stated, we think that upon the proper construction of the Act of 1885 the state did not propose to contract for an immunity to the telegraph company for charges of this character. As this appeal brings here only the questions raised by the demurrer, we deal with nothing else."

The legislation of the state of Tennessee upon the subject was as follows:

"In Section 1 of an act entitled 'An act to reduce the charter of Memphis, and the several acts amendatory thereof, into one act, and to revise the same' (Chapter 26, p. 225, Acts Tenn. 1869-70), it is provided, among other things, 'that the city council may do all things as a natural person.' Section 46 (page 235) of said act provided that the general council of the city of Memphis shall have power 'to close up, transfer, or sell any street, alley or public easement, and shall have and exercise complete and perfect control over all the streets, squares and other property of the city, whether lying within or without the limits of the city.' The Act of 1869-70 enumerated all the rights, pow-

ers, and privileges and property rights belonging to the city of* Memphis prior to the act of 1879. By Section 1, c. 10, p. 13, of the Acts of 1879, the Act of 1869-70, just quoted, was repealed, and Section 4, c. 10, p. 14, Acts 1879, expressly provided that: 'The public buildings, squares, promenades, wharf, streets, alleys, parks and fire-engines * * * and all other property, real and personal, hitherto used by such corporation for municipal purposes are hereby transferred to the custody and control of the state' to remain public property, as it has always been, for the uses to which said property has hitherto been applied.' * * * The legislature of Tennessee of 1879 passed an act transferring this same property which it had withdrawn from the city of Memphis by Chapter 10 of said acts back to the board of fire and police commissioners of that city—using almost the identical language that was used in Section 4, c. 10, p. 14, of said acts—and conferred upon the said board of commissioners of the city of Memphis substantially the same rights and powers and control over its streets, alleys, and public easements. See Section 3, c. 11, p. 16, Acts Tenn. 1879. It appears from this legislation that the charter of the city of Memphis, under which it was operating at the time the defendant company entered within its limits and began the erection of its poles, as well as at the time the ordinance was adopted authorizing the collection of the pole rental sued for in this case, vested the city council or board of commissioners with the power 'to close up, transfer, or sell any street, alley or public easement, and to have and exercise complete and perfect control over all the streets, squares and other property of the city, whether lying within or without the limits of the city,' and 'that the city council may do all other things as a natural person.' " * * *

"The legislature of Tennessee (1849-50) enacted the

original law granting rights of way to telegraph companies. Chapter 111, p. 303, Acts Tenn. 1849–50. ·This law remained practically unchanged until the adoption of the Code of Tennessee (1858). Section 1316 and subsequent sections, Title 8, c. 9, of the said Code of Tennessee, provides, in substance, that any person or company may construct a telegraph line along the public highways or streets of this state, or across the rivers, or over any lands belonging to the state, free of charge, and over the lands of private individuals, as therein provided, and may erect the necessary fixtures therefor. Said fixtures not to be constructed so as to obstruct any highway, street, or navigable stream; nor shall they be set up upon the lands of an individual, unless by contract, without paying such damages as the party sustained. In consideration of the right of way over the public property so conceded, every telegraph company, in case of war, insurrection or civil commotion of any kind, or for the arrest of criminals, was to give immediate dispatch, at the usual rate of charge, to any message connected therewith of any officer of this state or of the United States. It was made a misdemeanor for any employe of such company to refuse to give immediate dispatch to such message. These sections of the Code were repealed by the legislature of 1885, and the following statute enacted:

" 'Any person or corporation organized by virtue of the laws of this state, or any other state of the United States, or by virtue of the laws of the United States, for the purpose of transmitting intelligence by magnetic telegraph or telephone, or other system of transmitting intelligence, the equivalent thereof, which may hereafter be invented or discovered, may construct, operate, and maintain such telegraph, telephone, or other lines necessary for the speedy transmission of intelligence, along and over the public highways and streets of the cities and towns of this state, or across and under the waters and over any lands and public

works belonging to this state, and on and over the lands of private individuals, and upon, along and parallel to any of the railroads or turnpikes of this state, and on and over the bridges, trestles or structures of said railroads: provided that the ordinary use of such public highways, streets, works, railroads, bridges, trestles or structures and turnpikes be not thereby obstructed, or the navigation of said waters impeded, and that just damages shall be paid to the owners of such lands, railroads and turnpikes, by reason of the occupation of such lands, railroads and turnpikes, by said telegraph or telephone corporations.   *   *   *'

" 'Sec. 5.   In consideration of the right of way over the public property herein conceded, every telegraph or telephone corporation shall, in the case of war, insurrection, or civil commotion of any kind, and for the arrest of criminals, give immediate dispatch at the usual rates of charge, to any message connected therewith of any officer of the state, or of the United States.'   Acts Tenn. 1885, p. 120, c. 66."

It will be observed that this case turns upon a question of statutory construction, the whole matter being summed up in a single statement that, as the legislature had expressly granted to the city the absolute and entire control of its streets and alleys, and given it the same power with reference thereto as an individual, a grant by it to a telegraph company of a right to the use of the streets of a city, subject to the control of the city, was nothing more than a permissive right, and that the city had the right to exact pole and wire rental taxes.

The case is not controlling, for the reason that no such grant of power to the municipalities of this state has ever been given by our legislature, and we have heretofore held that the grant made by the legislature to telegraph and telephone companies is a contract which gave the com-

panies certain rights in and to the public highways and streets of a town or city. Moreover, as already pointed out, when the cities and towns of this state have the fee title to their streets and alleys, it is in trust for the public, and they have no such proprietary rights as that they may demand compensation for any public use which the legislature may see fit to grant. This is pointed out in other parts of this opinion. See, also, in the same connection, *Anhalt v. Waterloo, C. F. & N. R. Co.,* 166 Iowa 479; *East Hartford v. Hartford Bridge Co.,* 10 How. (U. S.) 511. Moreover, the courts of the country have generally placed an entirely different construction upon legislation similar to that used in the *City of Memphis* case. See *City of Texarkana v. Southwestern Tel. & Tel. Co.,* (Texas) 106 S. W. 915; *Michigan Tel. Co. v. City of Benton Harbor,* (Mich.) 80 N. W. 387; *City of Wichita v. Old Colony Trust Co.,* 132 Fed. 641; *City of Council Bluffs v. Kansas City, St. J. & C. B. R. Co.,* 45 Iowa 338.

We are not to be understood as holding that a municipality may not, *under express legislative authority,* impose a license fee, or that it may not exercise its police power over telegraph and telephone companies, or that these companies are not subject to taxation, both by the state and the city; but the ordinance in question does not impose a license and is not an exercise of the police power, and it is not the imposition of a tax, for such companies are otherwise taxed for state, city and county purposes.

It is clearly a revenue measure, and there seems to be no express legislative power for such an ordinance. Indeed, it is well to note that the decision last referred to is somewhat wide of the mark, for the reason that this case was not submitted on the theory of the validity of the ordinance, but solely upon the basis of an implied promise to pay reasonable rental value for space occupied by defendant's poles and wires. *Wisconsin Tel. Co. v. City of*

Milwaukee, (Wis.) 104 N. W. 1009 (1 L. R. A. [N. S.] 581), is an instructive one on all the propositions here involved. To conclude a discussion already too long, we reach the conclusion that under no theory is the city entitled to recover from the telephone company the rental value of its streets used by said company with its poles and wires.

Under our previous decisions, the defendant was granted, by a legislative body having authority to do so, the right to use these streets without compensation to the city; and, aside from any question regarding the power of the city to exact license fees, pass regulatory acts in virtue of its police power, or to tax the company's property, it has no right to recover for the use and occupation of its streets, against a public service corporation such as a telegraph, telephone or railway company, which had been given express legislative authority to use the streets and highways.

Every proposition involved has heretofore been decided by this court, and we have no disposition to change the rule heretofore announced. The difficulties here presented and the supposed injustice resulting are not due to the courts, but to the legislature, and primarily to the people themselves. In the early history of every city and state, in this age of scientific development and discovery, new and important devices intended for the use and benefit of the people are eagerly sought after and generally encouraged. In their infancy, these utilities seem to need the fostering care of the state, or of its municipalities. The people of both the state and its instrumentalities are anxious to secure the advantage of these improvements, and so they offer all sorts of inducements, and grant them most favorable franchises, in order that they may keep up with the times. They have little concern about the future; and so, in order to secure immediate benefits, they use their powers most liberally, and grant favors and bonuses without stint. Ofttimes, too, this has been necessary, in order to induce the

investment of capital. This has happened with reference to
railroads, telephones and telegraphs, waterworks, and vari-
ous other utilities which might be mentioned. The writer
well remembers the advent of the telephone, and has watched
its growth. First it was purely a local affair; then short
lines connected some of the towns; and finally it spread over
the entire country, so that it is now possible for one in New
York to talk with another in San Francisco. In the early
days, every town wanted an exchange; next it wanted toll
lines connecting its exchange with other exchanges in neigh-
boring towns. Every one wanted a phone. At this stage,
the legislature was appealed to, and no one thought at that
time of charging for the use of poles or wires upon either
public highways or streets. The main thing was to secure
them, and to get capital wherewith to procure them. No one,
it seems, could foresee the tremendous development of this
industry; and so the legislature passed the act giving to
telephone companies the right to construct their poles and
wires over and along every highway and street in the state,
in order to encourage their development. Capital was in-
vested on this basis, and the business has become very
large. Now it appears that these grants and franchises
were valuable, and the use of the streets and public high-
ways is thought to be worth something. In this situation,
attempt is being made to collect rentals for the use thereof.
It is a clear case of hindsight, and not foresight; but our
courts are confined to a definition of rights under the
original grants, save as these may be modified under the
reserved power of the state. There has been no exercise of
this reserved power in such a manner as to affect defendant's
rights under its original grant. Of course, neither the city
nor the state bartered away its police power, or the power
of proper regulation and control of wires and poles in the
interest of public safety. The right of taxation exists, and
so does the power of eminent domain; but the right to

claim a rental for the use of the streets has not been recognized, nor is there any express authority to collect it.

The trial court was in error in its instructions, and the judgment must be and it is—*Reversed.*

The foregoing opinion was prepared by Justice Deemer, and submitted before his death, and is now adopted by the court.   The following Justices concur: GAYNOR, C. J., LADD, EVANS, and SALINGER, JJ.

WEAVER and PRESTON, JJ., dissent.