Johnson, J.
The ordinance prohibits loads in excess of ten tons being driven over the streets of *379 the city without the permission, under specified circumstances, of the director of public service, and the sections of the General Code referred to prohibit loads in excess of twelve tons over improved public streets.
The city rests its contention as to the validity of the ordinance upon the authority given to it by the provisions of Sections 3 and 7, Article XVIII of the Constitution. Section 3 is familiar. It reads as follows: “Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.”
Plaintiff in error insists that the sections of the statute above referred to having by inference permitted loads up to twelve tons over and upon improved public streets, the city has no power to pass the ordinance regulating loads upon its own streets, such as here involved.
It is of course well known that the above provision of the constitution has been under examination by this court in a number of cases, which are familiar, and which it is not necessary to refer to in detail.
Within a very short time after the new constitution went into effect in January 1913, a few months thereafter, and while the courts and people were fresh from the discussions in the educational campaign which preceded the adoption of the new constitution in September 1912, the case of The State, ex rel. City of Toledo, v. Lynch, Auditor, 88 Ohio St., 71, was decided.
*380 It was everywhere agreed that the purpose of the amendment in 1912 was to alter the situation which had prevailed prior thereto, and in which municipal corporations had possessed only such power as was granted to them by the legislature.
It was conceded that after the amendment the source of governmental authority, and the measure of its extent in municipalities which adopted charters, was the constitution itself; and that by the adoption of charters cities were authorized to s.ecure immunity from general laws. The only question was as to the method of procedure.
Shauck, C. J., who spoke for the court in that case, said at page 93: “This article provides two modes of securing the permitted immunity from the operation of the uniform laws which the legislature is required to pass..” He then set out tne two modes in detail, one of which is the adoption of a charter by a municipality for its own government, under which it is authorized to exercise “all powers of local self-government.”
The judges who did not concur in the opinion of the court as pronounced by Shauck, C. J., did not withhold their assent because they felt that, the majority were going too far, but, as shown by the opinions thejr filed in the cas.e, they in addition thought that the provisions for local self-government were self-executing. But the court was unanimous in the view that by the amendment to the constitution municipalities were given immunity from general laws, as stated.
It has been constantly recognized that it was contemplated by the framers of the amendment to *381 the constitution that .the provisions in a charter adopted by a city would differ from the general laws of the state. The object of the amendment was to permit such differences and to make them effective. The State, ex rel. Lentz et al., v. Edwards et al., 90 Ohio St., 305, and Billings et al. v. The Cleveland Railway Co., 92 Ohio St., 478.
But it is insisted that the clause in the section referred to which reads, “and to adopt and enforce within their limits such local police, sanitary and other-similar regulations, as are not in conflict with general laws” prevents the passage by a municipality of an ordinance which limits loads on its improved streets to ten tons, after the legislature had passed Section 7246 et seq., which by inference permits loads of twelve tons on‘improved streets.
In Billings v. Railway Co., supra, the authority of the city of Cleveland to include in its charter a provision that consent of abutting owners of property shall not be required for the construction, extension, maintenance or operation of a public utility by original grant or renewal, unless such public utility is of such a character as to constitute an additional burden upon the rights of property owners in such highways, was involved. It was held that the granting of permission and the making of a contract to construct and operate a street railway in the streets of a city is a matter that may be provided for in a charter adopted by a municipality under Article XVIII of the Constitution.
It was urged in that case that the charter provision was invalid because it conflicted with the provisions of Sections 3777 and 9105 of the Gen *382 eral Code, which required the consents of a majority of property owners, as represented by the foot front, as a condition for the making of the grant referred to. It is said in the opinion, at page 485: “The claim of the plaintiffs in this case is that the ownership and control of the streets for the purpose of travel is vested in the legislature as the representative of the people of the state.”
It was in that case shown that until the adoption of the amendments in 1912 the course of legislation under the old constitution seemed to clearly disclose that the control of streets had been regarded as a matter chiefly of municipal concern; the control to be exercised under such regulations as the legislature prescribed, it being, until the amendments, the source of municipal authority.
The Revised Statutes, and afterwards the General Code, provided that municipalities shall have power to lay off, establish, plat, grade, open, widen, narrow, straighten, extend, improve, keep in order and repair, light, clean and sprinkle streets, and shall have the care, supervision and control of public highways and streets within the corporation, shall cause them to be kept open, in repair and free from nuisance; and also provided that streets may be vacated by the city, and their continued use as streets abandoned. Sections 3632 and 3635, General Code, empower the city to adopt regulations to prevent injury to highways from overloaded vehicles and to prescribe width of tires of vehicles used for transportation.
In the Billings case it was held that there was no property right involved, and the rule laid down in *383 Hamilton, Glendale & Cincinnati Traction Co. v. Parish, 67 Ohio St., 181, was approved, to the effect that the consents of owners of lots abutting on a street to the construction and operation of a street railroad on such street are not property-rights, but rights in their nature personal to each owner of an abutting lot; that such personal rights were bestowed by the general assembly on the owners as a check on the power of municipal authorities. The court in the Parish case say, at page 192: “This was done, as held by this court in Roberts v. Easton, 19 Ohio St., 86: ‘To protect owners of property on the streets of cities * * * from the exercise of arbitrary power on the part of the city authorities in permitting the streets to be used for street railroads.’ ”
The view in those cases was that the statute requiring consents of abutting owners was in the nature of a restraining regulation to protect the property owners in the manner stated. It was an exercise of the police power. But in the Billings case it was held that under the home-rule amendment the state had no power to impose such restraint, and that the city, in the exercise of the governmental authority therein conferred, had control of its streets and was permitted to make provision in its charter for the construction and operation of the street railway in its street's, wholly without reference to and unaffected by the general laws of the state touching the subject.
Mr. Justice Brewer in St. Louis v. Western Union Tel. Co., 149 U. S., 465, said at page 467: “Control over the streets resides, somewhere. As *384 the legislative power of a State is vested in the legislature, generally that body has the supreme control, and it delegates to municipal corporations such measure thereof as it deems best. The city of St. Louis occupies a unique position. It does not, like most cities, derive its powers by grant from the legislature, but it framed its own charter under express authority from the people of the State, given in the constitution.” And, again, at page 472, he said: “But if the city had power to contract * * * for the use of the streets, it was because it had control over that use.” Ohio cities now have the same status under our constitution that St. Louis had then, in the respects referred to.
Now, if the location, vacation, extension, widening, curbing, guttering, paving, maintenance and control of streets are attributes of local self-government, which belong to the municipal governments under the home-rule amendment, it is only the application of the most familiar principles to say that the city is entitled, as a necessary incident to these attributes and this control, to do everything that is reasonably necessary to make them effective. And there is no language in the home-rule amendment which indicates that it was ever intended that the right of the city under that amendment to exercise the governmental control of the streets should end when it had located and surveyed the street, prescribed its width and grade, excavated it and put in the broken stone and concrete, laid the brick, stone or asphalt upon it, paid for all of these things out of the municipal treasury and assumed full responsibility for keeping the street *385 open, in repair and free from nuisance; and that thereafter this domestic, municipal and local concern should be subject to the uninformed supervision of a foreign authority. It is a necessary incident to the governmental power of the city to do the things above stated in the construction and control of its streets, to make such reasonable provisions for their proper and economic use as its close knowledge of the necessities of the situation and the structure of the streets themselves demonstrates to be proper.
Knowledge of its own conditions might lead a city to construct streets of such heavy material and in such manner in the manufacturing and wholesale sections as to make proper the passage over them of loads heavier than twelve tons, and thus to assist in the advancement of its commercial and industrial enterprises.
The object of the home-rule amendment was to permit municipalities to use this intimate knowledge and determine for themselves in the exercise of all the powers of local self-government how these and similar local affairs should be conducted.
There is no express declaration in Section 3 of Article XVIII that the general laws referred to therein include the right to take out of the control of municipalities streets that have been laid off, constructed and improved by them, and paid for by their citizens, and there is no- implication of such authority from the clause “and to adopt and enforce within their limits such local police, sanitary and similar regulations as are not in conflict with *386 general laws.” The implication that arises from that clause is to be drawn from the use of the words “local” and “general.” The context shows that they both relate to “police, sanitary and similar regulations.” The general laws concerning these things are manifestly laws which apply uniformly throughout the state. They are general for that reason. They involve the concern of the state for the peace, health, morals and safety of all of its people, and the protection of their property and rights, wholly separate from and without reference to any of its political subdivisions; such laws for instance as regulate the morals, of the people, the purity of their food, the protection of the streams, the protection of life and property, the safety of buildings, and similar matters. These matters are not local — they are general.
When the state passes a law which prevents the running of an automobile upon highways faster than at a certain rate, and in the business and closely built up portions of a city faster than at a certain lesser rate, that is a regulation for the protection of the lives of the people of the whole state and has no special relation to any of the political subdivisions of the state. Such a law applies upon all streets without reference to the character of the street or its structure, except as prescribed by the law itself. But the prescribing of the maximum weight of loads which may be moved upon a street constructed and improved by a city in accordance with its particular conditions and requirements is not a regulation of the character referred to in Section 3 of Article XVIII.. That simply looks to a *387 matter of business management and economic wisdom in connection with the city’s local governmental affair.
Plaintiff in error cites The Cleveland Telephone Co. v. The City of Cleveland, 98 Ohio St., 358. The telephone company operated a line partly within and partly without the city. The controversy was with reference to the authority of the city to fix rates for service furnished by the company. The company had in former years, entered the city and constructed the line pursuant to statutes then in force. The line was the property of the company. No part of the expense of construction or maintenance was paid by the city. The city had no proprietary interest in the property or the enterprise; and had no duty and was subject to no liability in connection with its operation. The majority of the court in that case held that the city did not have the power to fix the rate. Two members, Judges Wanamaker and Johnson, did not concur.
In Stange v. The City of Cleveland, 94 Ohio St., 377, also cited, there was involved an express constitutional provision, Section 37, Article II, which provides that except in emergencies not to exceed eight hours shall constitute a day’s work for workmen engaged in any public work carried on by the state or any public subdivision thereof, whether done by contract or otherwise. This provision was found not to be self-executing, the legislature had enacted no law to enforce it which covered the time of violation by the defendant, and the ordinance of the city was, therefore, held valid. But as the con *388 stitutional provision had expressly applied to the entire state concerning public work carried on by the state, or any of its subdivisions, it was necessarily incumbent upon the general assembly to enact a law to enforce the provision in the entire state. The power and duty to enact that legislation was general and its application was state-wide. The constitutional provision and its, purpose to conserve the health and strength of the people apply alike to the people of the whole state. It is such a general regulation as we have described.
The history of legislation in Ohio during a long period shows that the term “police regulations” has been treated as having the meaning we have above indicated. (Fitzgerald et al. v. The City of Cleveland, 88 Ohio St., 338, 359.) The constitutional convention must have had this long-accepted meaning in mind when it used the term. The phrase is “local police, sanitaiy and other similar regulations.” Why specify “sanitary and other similar regulations” if the words “police regulations” were intended to be all inclusive.
In a very recent case, Sligh v. Kirkwood, Sheriff, 237 U. S., 52, at page 59, it was said concerning the police power: “At an early day it was held to embrace every law or statute which concerns the whole or any part of the people * * *. The police power, in its broadest sense, includes all legislation and almost every function of civil government.”
It is therefore very apparent that the clause in question here could not have been intended to include every law passed by the legislature as dis *389 tinguished from general laws prescribing “police, sanitary and other similar regulations,” for in that case the provision in the same section (Section 3) conferring all powers of local self-government on the municipality would be vain and meaningless. Such a construction would make Section 3 self-contradictory and self-destructive. It would violate a rule which has been universally approved, and which requires that the whole section should be construed together and that effect must be given to every part and sentence.
As stated by Cooley in his work on Constitutional Limitations (7 ed.), page 92: “One part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together.” By specific grant from the people the municipality became clothed with part of the sovereign power of the state, that is, as said by Shauck, C. J., in the Lynch case, supra, such powers of government as in view of their nature and the field of their operation are local and municipal in character. There was entire agreement in that, case that by the municipal home-rule amendment the people made a new distribution of sovereign governmental power.
As stated in Billings v. Railway Co., supra, at page 485:
“This involves no lack of the harmony that is essential and no loss by the state of its proper authority over the city and its people. The charter becomes the organic law of the municipality so far as such local powers are concerned. But the authority of the state is supreme over the municipality *390 and its citizens as to every matter and every relationship not embraced within the field of local self-government.
“A fine illustration of the successful working out of the division and distribution of sovereign governmental powers is furnished by the national and state governments in the American system.”
The federal government and each state occupies and moves within its own sphere in the exercise of its powers. Each is sovereign within its own sphere. On many matters in which congress has paramount jurisdiction, the state may legislate until such time as congress acts upon the subject. As to such matters, when the power of the national government is exercised, that of the state is superseded.
Since the foundation of the government the courts of the country have, in numerous cases, been called upon to consider the line between the authority of the federal government and that of the states. Although there has been a gradual and satisfactory progress, no full and exact definition of the .dividing line has even yet been made. That is, disputes concerning it still arise. However, no one has ever contended that there is no such dividing line, or, that, because of the absence of an exact and complete definition of it, the exercise of the divided sovereignty was impossible or impracticable.
Section 7 of the home-rule amendment confers power on the municipality to frame and adopt a charter for its government, and to exercise thereunder all powers of local self-government as pro *391 vided by Section 3. That is, the people of the municipality are given power to construct the machinery of their own local government and to operate it themselves.
A charter is not power. It is the symbol of power. It provides the means and the methods to exercise powers. But it is us.eless unless the powers intended to be exercised are at hand.
It must be remembered that neither the state in the passage of general laws, nor the municipality in the passage of local laws, may make any regulations which are unreasonable. The means adopted must be suitable to the ends in view, they must be impartial in operation and not unduly oppressive upon individuals, must have a real and substantial relation to their purpose, and must not interfere with private rights beyond the necessities of the situation. 6 Ruling Case Law, 236; In re Steube, 91 Ohio St., 135, 140; The Toledo Disposal Co. v. The State of Ohio, 89 Ohio St., 230; 19 Ruling Case Law, 805; Mo. Pac. Ry. Co. v. Tucker, 230 U. S., 340, 347, and Cincinnati v. Pub. Util. Comm., 98 Ohio St., 320.
For instance, the ordinance involved in this case could, in a proper proceeding, be subjected to the test of its reasonableness and its impartiality in its application, but such a test does not affect the power of the municipality to enact legislation that is reasonable and impartial.
The constitution authorizes the city to exercise part of the sovereign power, and in the proper exercise of that part it is immune from general laws. If this is not so, it will have been demonstrated *392 that this provision of the organic law, which was so long desired and so thoroughly discussed, and which the people believed had given them the power to manage their own local affairs, is an empty shell.
The judgment will be affirmed.

Judgment affirmed.

Nichols, C. J., Matthias, Wanamaker and Robinson, JJ., concur.