# ST. LOUIS *v.* WESTERN UNION TELEGRAPH COMPANY.

PETITION FOR A REHEARING OF A CASE DECIDED MARCH 6, 1893, AND REPORTED 148 U. S. 92.

No. 94. Submitted April 27, 1893. — Decided May 15, 1893.

The city of St. Louis is authorized by the Constitution and laws of Missouri, to impose upon a telegraph company putting its poles in the streets of the city, a charge in the nature of rental for the exclusive use of the parts so used.

THE defendants in error in this cause, decided on the 6th of March last and reported 148 U. S. 92, having asked leave to file a petition for a rehearing, the court, in granting leave, also gave the parties leave to file briefs on the question: "Whether the city of St. Louis has such interest in and

control over the streets, alleys and public places within its limits as authorizes it to impose upon the telegraph company a charge in the nature of rental for the exclusive use of portions thereof in the manner stated."

Mr. John F. Dillon, Mr. Rush Taggart and Mr. Elenenious Smith for petitioner filed a brief citing: Scheme and Charter of the city of St. Louis, adopted August, 1876, 2 Rev. Stats. Missouri, 1879, p. 1572; Constitution of Missouri, Art. IX, § 23, Art. XII, § 20; St. Louis v. Bell Telephone Co., 96 Missouri, 623; Julia Building Association v. Bell Telephone Co., 13 Mo. App. 477; S. C. affirmed 88 Missouri, 258; Glasgow v. St. Louis, 87 Missouri, 678; Belcher Sugar Refining Co. v. St. Louis Grain Elevator Co., 101 Missouri, 192; Lackland v. Northern Missouri Railroad, 31 Missouri, 180, 185; Glaessner v. Anheuser-Busch Brewing Association, 100 Missouri, 508, 514; Cummings v. St. Louis, 90 Missouri, 259; Matthews v. Alexandria, 68 Missouri, 115; Ferrenbach v. Turner, 86 Missouri, 416; Atlantic & Pacific Railroad v. St. Louis, 66 Missouri, 228.

They contended that these cases showed conclusively: (1) That under the provisions of the "Scheme and Charter" of 1876, as well as the charters of the city that existed prior to that date, the superior and paramount control of the streets of the city of St. Louis is in the public represented by the Legislature of the State: (2) That the city has absolutely no power to rent, lease or in any manner convey any portion of the streets of the city for any use inconsistent with the public street uses proper: (3) That the city has no power to lease or in any manner dispose of any portion of the streets for private purposes; and only so far as public enterprises are concerned to the extent specially delegated: (4) That so far as a municipal corporation of the State of Missouri is concerned, it has not the power to rent portions of the street in the manner in which it has power to rent its unoccupied buildings, park privileges, etc.

Mr. W. C. Marshall filed a brief opposing.

BREWER, J. In the opinion heretofore announced it was said: " We do not understand it to be questioned by counsel for the defendant that, under the constitution and laws of Missouri, the city of St. Louis has the full control of its streets in this respect and represents the public in relation thereto." A petition for a rehearing has been filed, in which it is claimed that the court misunderstood the position of counsel; and, further, that in fact the city of St. Louis has no such control. Leave having been given therefor briefs on the question whether such control exists have been filed by both sides, that of the Telegraph Company being quite full and elaborate.

We see no reason to change the views expressed as to the power of the city of St. Louis in this matter. Control over the streets resides somewhere. As the legislative power of a State is vested in the legislature, generally that body has the supreme control, and it delegates to municipal corporations. such measure thereof as it deems best. The city of St. Louis occupies a unique position. It does not, like most cities, derive its powers by grant from the legislature, but it framed its own charter under express authority from the people of the State, given in the constitution. Sections 20 and 21 of Article 9 of the Constitution of 1875 of the State of Missouri authorized the election of thirteen freeholders to prepare a charter to be submitted to the qualified voters of the city, which, when ratified by them, was to " become the organic law of the city." Section 22 provided for amendments, to be made at intervals of not less than two years and upon the approval of three-fifths of the voters. Sections 23 and 25 required the charter and amendments to always be in harmony with and subject to the constitution and laws of Missouri, and gave to the general assembly the same power over this city, notwithstanding the provisions of this article, as was had over other cities. In pursuance of these provisions of the constitution a charter was prepared and adopted, and is, therefore, the " organic law " of the city of St. Louis, and the powers granted by it, so far as they are in harmony with the constitution and laws of the State, and have not been set aside by any act of the general assembly, are the powers vested in the city. And this charter is an or-

ganic act, so defined in the constitution, and is to be construed as organic acts are construed. The city is in a very just sense an "*imperium in imperio.*" Its powers are self-appointed, and the reserved control existing in the general assembly does not take away this peculiar feature of its charter.

An examination of this charter (2 Rev. Stat. Mo. 1879, pp. 1572, and following) will disclose that very large and general powers are given to the city, but it would unnecessarily prolong this opinion to quote the many sections defining these powers. It must suffice to notice those directly in point. Paragraph 2 of section 26 of article 3 gives the mayor and assembly power, by ordinance "to establish, open, vacate, alter, widen, extend, pave, or otherwise improve and sprinkle all streets, avenues, sidewalks, alleys, wharves, and public grounds and squares, and provide for the payment of the costs and expenses thereof in the manner in this charter prescribed; and also to provide for the grading, lighting, cleaning and repairing the same, and to condemn private property for public uses, as provided for in this charter; to construct and keep in repair all bridges, streets, sewers and drains, and to regulate the use thereof," &c. The 5th paragraph of the same article grants power "to license, tax, and regulate . . . telegraph companies or corporations, street railroad cars," &c. Article 6 treats of public improvements, including the opening of streets. Section 2 provides for condemning private property, and "for establishing, opening, widening or altering any street, avenue, alley, wharf, market place or public square, or route for a sewer or water pipe." By section 4, commissioners are to be appointed to assess the damages. By section 5, it is made the duty of these commissioners to ascertain the actual value of the land and premises proposed to be taken, and the actual damages done to the property thereby; "and for the payment of such values and damages to assess against the city the amount of benefit to the public generally, and the balance against the owner or owners of all property which shall be especially benefited by the proposed improvement in the opinion of the commissioners, to the amount that each lot of such owner shall be benefited by the improvement." Except, therefore,

for the special benefit done to the adjacent property, the city pays out of its treasury for the opening of streets, and this power of the city to open and establish streets, and the duty of paying the damages therefor out of the city treasury, were not created for the first time by this charter, but have been the rule as far back as 1839.

Further than that, with the charter was, as authorized by the constitution, a scheme for an enlargement of the boundaries of the city of St. Louis, and an adjustment of the relations consequent thereon between the city and the county. The boundaries were enlarged, and by section 10 of the scheme it was provided that —

"Sec. 10. All the public buildings, institutions, public parks, and property of every character and description heretofore owned and controlled by the county of St. Louis within the limits as extended, including the court-house, the county jail, the insane asylum, and the poor-house, are hereby transferred and made over to the city of St. Louis, and all the right, title and interest of the county of St. Louis in said property, and in all public roads and highways within the enlarged limits, is hereby vested in the city of St. Louis, and divested out of the county; and in consideration of the city becoming the proprietor of all the county buildings and property within its enlarged limits, the city hereby assumes the whole of the existing county debt and the entire park tax." (2 Rev. Stat. Mo. 1879, p. 1565.)

Obviously, the intent and scope of this charter are to vest in the city a very enlarged control over public property and property devoted to public uses within the territorial limits.

It is given power to open and establish streets, to improve them as it sees fit, and to regulate their use, paying for all this out of its own funds. The word "regulate" is one of broad import. It is the word used in the Federal Constitution to define the power of Congress over foreign and interstate commerce, and he who reads the many opinions of this court will perceive how broad and comprehensive it has been held to be. If the city gives a right to the use of the streets or public grounds, as it did by ordinance No. 11,604, it simply

regulates the use when it prescribes the terms and conditions upon which they shall be used. If it should see fit to construct an expensive boulevard in the city, and then limit the use to vehicles of a certain kind or exact a toll from all who use it, would that be other than a regulation of the use? And so it is only a matter of regulation of use when the city grants to the telegraph company the right to use exclusively a portion of the street, on condition of contributing something towards the expense it has been to in opening and improving the street. Unless, therefore, the telegraph company has some superior right which excludes it from subjection to this control on the part of the city over the streets, it would seem that the power to require payment of some reasonable sum for the exclusive use of a portion of the streets was within the grant of power to regulate the use. That the company gets no such right from the general government is shown by the opinion heretofore delivered, nor has it any such from the State. The law in force in Missouri from 1866, gives certain rights in streets to " companies organized under the provisions of this article." Of course, the defendant, a corporation organized under the laws of the State of New York, can claim no benefit of this. It is true that, prior to that time, and by the act of November 17, 1855, (2 Rev. Stat. Mo. 1855, p. 1520,) the right was given to every telegraph corporation to construct its lines along the highways and public roads; but that was superseded by the legislation of 1866; and when in force it was only a permission, a license, which might be revoked at any time; and, further, whatever rights, if any, this defendant may have acquired to continue the use of the streets already occupied at the time of the revision of 1866, it cannot with any show of reason be contended that it received an irrevocable power to traverse the State and occupy any other streets and highways.

Neither have we found in the various decisions of the courts of Missouri, to which our attention has been called, any denial of the power of the city in this respect. It is true, in *Glasgow* v. *St. Louis*, 87 Missouri, 678; *Cummings* v. *St. Louis*, 90 Missouri, 269; *Glaessner* v. *Brewing Association*, 100 Missouri,

508; and *Belcher Sugar Refining Co. v. St. Louis &c. Grain Elevator Co.*, 101 Missouri, 192, the power of the city to devote the streets or public grounds to purely private uses was denied; but in the cases of *Julia Building Association v. Bell Telephone Co.*, 88 Missouri, 258, and *St. Louis v. Bell Telephone Co.*, 96 Missouri, 623, it was expressly held that the use of the streets for telephone poles was not a private use, (and of course telegraph poles stand on the same footing,) and that a private corporation carrying on the public service of transportation of messages might be permitted to use the streets for its poles. Counsel rely strongly upon the latter of these cases, in which the power of the city to regulate the charges for telephone service was denied. But obviously that decision does not cover this case. The relation of a telephone or telegraph company to its patrons, after the use of the streets has been granted, does not affect the use, and power to regulate the use does not carry with it by implication power to regulate the dealings between the corporation having such use and its individual patrons; but what the company shall pay to the city for the use is directly involved in a regulation of the use. The determination of the amount to be paid for the use is as much a matter of regulation as determining the place which may be used or the size or height of the poles. The very argument made by the court to show that fixing telephone charges is not a regulation of the use, is persuasive that fixing a price for the use is such a regulation. Counsel also refer to the case of *Atlantic and Pacific Railroad v. St. Louis*, 66 Missouri, 228, but there is nothing in that case which throws any light upon this. In that it appeared that there was an act of the legislature giving to the railroad company a specific right in respect to the construction of a track within the city limits, and it was held that the company was entitled to the benefit of that act, and to claim the right given by the general assembly, although it had after the passage of the act proceeded in the construction of the track under an ordinance of the city purporting to give it the privilege. But, as we have seen, the act of November 17, 1855, vested in defendant no general and irrevocable power to occupy the streets in

any city in the State through all time. We find nothing, therefore, in the cases cited from the Missouri courts which militates with the conclusions we have drawn as to the power of the city in this respect.

One other matter deserves notice: It will be seen by referring to our former opinion that one of the contentions of the counsel for the telegraph company was that by ordinance No. 11,604 the city had contracted with the company to permit the erection of these poles in consideration of the right of the city to occupy and use the top cross-arm free of charge. We quote this statement of counsel's claim from their brief: " Ordinance 11,604 granted defendant authority to set its poles in the streets of the city without any limitation as to time, for valuable considerations stipulated; and having been accepted and acted on by defendant, and all of its conditions complied with, and the city having acquired valuable rights and privileges thereunder, said ordinance and its acceptance constitute a contract, which the city cannot alter in its essential terms without the consent of the defendant; nor can it impose new and burdensome considerations." And in respect to this, further on they say: "No question is or can be raised as to the validity of the contract made by ordinance No. 11,604, and its acceptance." But if the city had power to contract with defendant for the use of the streets, it was because it had control over that use. If it can sell the use for a consideration, it can require payment of a consideration for the use; and when counsel say that no question can be made as to the validity of such a contract, do they not concede that the city has such control over the use of the streets as enables it to demand pay therefor?

The petition for a rehearing is

*Denied.*