Jones, J.,
dissenting. In remanding this case to the Public Utilities Commission for the purpose of fixing and adjusting a schedule of rates to be '-charged by the public utility I am convinced that this court committed serious error: (1) By imposing upon the commission the arduous duties of fixing schedules when there has been no complaint made in reference thereto by the municipality or any other person; (2) For the reason that under the initiative of the city council, fixing the maximum rate only, followed by a complaint or appeal made under the statute relative - to that rate only, the Public Utilities Commission had no power under our public utilities statute to consider any other rate than that fixed by the ordinance.
The proceeding was initiated by the city council passing an ordinance under the provisions of Section 614-44, General Code. That section provides that a municipal corporation, by ordinance, at any time within one year before the expiration of any contract entered into under the provisions of Section 3982, General Code, “or at any other time authorized by law,”- may fix the rate that a public utility may charge for an ensuing period, as provided in Section 3982, General Code. Assuming to .proceed. under those sections, the city council on March 16, 1914, passed an ordinance fixing the “maximum electric light rate” at three cents per -kilowatt hour, and providing that the charge for electric light so supplied-should not exceed three cents per kilowatt hour. On April 24, 1914, the public utility filed a complaint under said Section 614-44, General Code, in which it challenged only *132 the rate so fixed by ordinance. The commission found that the rate fixed by ordinance was unjust and unreasonable and fixed a maximum rate of ten cents per kilowatt hour as a just and reasonable rate. Did the act of the commission in this respect conform to the requirements of the code, or was its action unlawful? If not unlawful, we have no power to reverse or modify its order.
First. In this case, under the public utility statute, the Public Utilities Commission had no power to review any other rate, or complaint with reference thereto, than thq rate fixed by ordinance. Section 614-44, General Code, provides for a complaint or appeal from such a rate to the’ Public Utilities Commission; or for acceptance of the rate "fixed by ordinance of such municipalityf’ under conditions therein named. Section 614-45, General Code, provides that such an appeal shall not suspend or vacate the rate fixed by the ordinance unless an undertaking be given.
However, if any question should arise as to the power of the Public Utilities Commission as to its requirement to consider schedules, such a power is denied and limited by Section 614-46, General Code., That section is important and- determines what the cqmrriission may hear on such an appeal.- It is as follows: ■
“If the commission, after such hearing, shall be of the' opinion that "the rate * * so fixed by ordinance is or will be unjust or unreasonable, * * * the commission shall * * * fix and determine the just and reasonable rate, * * * 9.nd order the same substituted for the rate * * * *133 so fixed by ordinance or the commission may find and declare that the rate, so fixed by ordinance, is just and reasonable, and ratify and confirm the same.”
This is the sole authority of the commission — either to ratify the rate so fixed by ordinance, or to substitute a rate of its own in lieu of the rate fixed in the ordinance. Acting under said Sections 614-44 and 3982, General Code, the city council fixed only the maximum rate which should be charged, and this it had ample legal authority to do under the case of Logan Nat. Gas & Fuel Co. v. Chillicothe, 65 Ohio St., 186, wherein the city of Chillicothe had established by its ordinance a maximum rate.
It will be noted that in the sections above referred to the word “schedules” does not appear. If the schedules of the public .utility are to be challenged they come within the purview of other sections of the public utilities act, wherein the word “schedules” is distinctly referred to- and provisions made whereby they may be attacked.
Sections 614-16. to 614-23, inclusive, General Code, deal with the subject of rates and schedules filed by a public utility with the commission, and it is distinctly provided by Sections 614-21 and 614-23, General Code, that a complaint against a public utility may be filed by any person or corporation against either rate or schedule which is complained of as unjust and unreasonable, and that the commission may, if it appear that there are reasonable grounds for the complaint, consider the complaint, and, after hearing, fix a just and reason *134 able rate that may be exacted and collected. Filed schedules and hearings are governed by these latter sections of the code. City of Cincinnati v. Public Utilities Commission, 96 Ohio St., 270.
It will be observed in this case that no complaint has been made with reference to any other than the maximum rate by any person, corporation, municipality, or even by the commission, and it is only after complaint, in any case, that the commission may proceed under any of the sections referred to.
The fear is expressed that the public utility, under the order of the commission, may charge the maximum rate of ten cents per kilowatt hour for every class of service. This fear is dissipated by the record. The maximum rate only was prescribed by the ordinance, and the maximum rate only was fixed by the commission, which explicitly retained jurisdiction “with full power to require a modification of its schedule and a change in the rates thereof or a readjustment of the same,” if the same should become necessary. Furthermore, the record discloses, that schedules had in fact been filed with the public utilities commission showing different rates for various classes of service, so that the fear is dissipated in fact. The testimony discloses that for the year ending June 30, 1916, the illuminating company furnished wholesale current for power at an average sale price of 1.103 cents per kilowatt hour; that for street lighting the sale price of the illuminating company was 3.5 cents per kilowatt hour; that in the residence district, for light and power, the average price was *135 5.56 cents per kilowatt hour; and that the average selling price for the entire output of the illuminating company was 1.77 cents per kilowatt hour.
. Second. The reason and policy* of the statute do not require the Public Utilities Commission to enter upon the long and arduous duties of fixing various rates, classifications and schedules where there is no complaint made with reference thereto by anyone. It may be that th$ schedule so filed by the public utility may be satisfactory to all concerned, so why should the policy of the statute require this commission to enter upon the large field of operation respecting classification, values, and the like, when no complaint has been brought to its notice? The law permits and this commission did in fact retain jurisdiction over the rates and schedules of this public utility during the life of the ordinance. ■Is if not reasonable, therefore, that either the commission itself or some interested person should challenge the reasonableness or justness, of rates and schedules filed, before the commission is required to act? The reasoning of the commission in its official opinion in this 'respect is unassailable, and I quote this much from if:
“The ordinance appealed from fixes only the maximum rate, and that is the' only rate under consideration. * * *
“It does not follow that when the maximum rate is fixed that rate should be charged for all electric lighting, It is doubtful if any considerable portion of if should be sold at the maximum figure. It is the duty of the Company, within, that maximum, to prepare and file a schedule which will adjust *136 rates in accordance with some reasonable classification, taking into consideration the quantity consumed, the cost of service, and such other differentiating elements as- are proper to be considered; and notwithstanding the fact that the Commission has named the maximum rate, the classification and rates extended to each class and kind of service will still be under its supervision. * * *.
“It is contended by the City that the Commission should fix a series of maximum rates for varying quantities; but this would be of little avail, for they would still be maximum rates, and there are other considerations quite as important as quantity upon which a sliding scale should be based. Such a course would require the Commission to make a schedule rather than fix a rate. In an extensive plant like this, the Company should have that minute detail of information which would enable it to distribute the burden equitably over the whole system, and which it would require years of investigation by the Commission to gain.”
For the reasons stated I am unable to concur in the judgment in this case.
Wanamaker, J.,
dissenting from order remanding. The one and only vital question'in this case, as I conceive it, is one affecting the jurisdiction of the Public Utilities Commission to make any order fixing the rates that The Cleveland Electric Illuminating Company may charge the city of Cleveland and its inhabitants for light, heat and power.
*137 I am not concerned as to whether or not the Public Utilities Commission proceeded regularly, that is, agreeable to statutes, in fixing the rates, which is the sole question with which the other members of the court seem concerned. I affirmatively and absolutely deny that the commission under the constitution and laws of Ohio has any right or jurisdiction whatsoever to fix such'rates.
How the Question Arises.
The city of Cleveland, pursuant to its charter adopted pursuant to its. constitutional right and power . under the home-rule amendment, particularly Section 3 and Section 7, Article XVIII, passed an ordinance fixing the maximum rate which the illuminating company might charge the city of Cleveland and its inhabitants at three cents for what is known as a kilowatt hour. The company dissatisfied with this rate undertook to appeal the case to the Public Utilities Commission of the state, which fixed the maximum rate- at ten cents per kilowatt hour, a flat increase of seven cents per kilowatt hour as to said maximum — an increase by the Public Utilities Commission of 233 1/3 per cent, over the rate fixed .by the city council of Cleveland.
The city of Cleveland at the threshold of the hearing challenged the entire -jurisdiction of the commission to review or revise the rates fixed by the ordinance. In the opinion filed in this case the court has carefully avoided all reference to the question of jurisdiction.
*138 If the city of Cleveland, under its charter powers, pursuant to the home-rule amendment, had the right to fix the rate, then the public utilities commission had not the right to fix'the rate. Necessarily, therefore, -this is the first question ber fore this court, as it was the first question before the commission.
If the Telephone case, 98 Ohio St., 358, The Cleveland Telephone Company v. City of Cleveland, was rightly decided, then the commission had the necessary jurisdiction.
If the Froelich case, decided nearly a year later, Froelich v. The City of Cleveland, 99 Ohio St., 376, was rightly decided, then the commission was without jurisdiction. The opinion is sensitively silent as to these two cases, but having remanded the case to the commission for further determination the presumption is that this court means to follow the Telephone case rather than the later Froelich case without undertaking to distinguish them, or to affirm the one and repudiate the other.
It may have been the wiser course. It is so much easier to assume that power in the commission 'than to argue it; it is so much easier to declare it than to demonstrate it. The doctrine I declared in my dissenting opinion in the Telephone case is pertinent here on the question of jurisdiction. Therein I denied the right of the commission to make a contract for the city of Cleveland and its inhabitants upon the one hand and the telephone company on the other. By the same process of reasoning, which I here adopt, I deny the right of the commission to fix rates for light, heat and *139 power between the city of Cleveland and its inhabitants upon the one hand and the illuminating company upon the other. Were it not for the Froelich case, and a more mature consideration of the doctrines announced by this court in the majority opinion in the Telephone case, I might well rest this dissent upon my opinion in the Telephone case.
By this decision Ohio home rule is dead, without hope of repair or resurrection until the decision shall be reversed. True, as to' petty, trifling, immaterial governmental functions, dealing with the names of its officers under the charter, and the distribution of their powers' under the charter, and minor ministerial governmental functions, the city may act for itself, yet when it comes to dealing with matters of finance, matters involving the sums assessed, the sums to be paid by the city and its inhabitants to various, public utility corporations, aggregating millions of dollars annually, the city .of Cleveland is absolutely powerless and wholly at the mercy of the general assembly of, Ohio and its numerous commissions.
Home rule was betrayed in the Telephone case, It is now being buried in this.
Municipal democracy was believed to be constitutionally born in Ohio in 1912. It has met an early death at the hands of this court, under the mask of judicial construction, which has proven the equivalent of judicial destruction.
Under the old order the .people of Ohio battled unsuccessfully with the general assembly for half a century or more for s.ome semblance of the *140 powers of home rule for cities and villages. The query now is, How long will they have to battle against the supreme court of Ohio before they get what they overwhelmingly voted for in 1912?
After this decision in this case, riveting general-assembly rule and commission! rule, the worst form of modern autocracy, wholly irresponsible to the people affected by its action, the hour is at hand for fair and fearless speech, to advise, if to no other purpose, the people of the cities and villages of Ohio as to what has happened to their boasted home rule.
Very recently this court decided the case of Froelich v. The City of Cleveland, supra. This case presented the question whether or not the city of Cleveland could regulate the weight of truck and load over its streets in a manner in conflict with a state statute upon the same subject. This court held that the city ordinance prevailed over the state statute under the home-rule amendment.
Johnson, J., rendered the opinion of the court, and the following members of this court concurred in that judgment, Nichols', C. J., Matthias, Wanamaker and Robinson, JJ. Jones, J., dissented.
Both the Telephone case and the Froelich case raised the identical question of municipal police power as against state police power.
In the Telephone case it related to a steel wire running over or under the streets of the city of Cleveland. In the Froelich case it related to a steel truck running over the streets of the city of Cleveland. The mere fact that in the one case a rate was fixed as to the steel wire and in the other case *141 a maximum weight for the steel truck does not alter the fact that both’are the exercise of police power, and it has so been held uniformly and without exception.
If the Telephone case was rightly decided, then the Froelich case was wrongly decided. They are entirely' repugnant, wholly irreconcilable and leave the attitude of this court on the exercise of municipal police power in the worst possible confusion, both for layman and lawyer.
Judge Shauck in the Lynch case, which is the parent home-rule case of Ohio, said much about the “immunity” of municipalities from general laws, and that one of the ways of accomplishing that “immunity” was “by the adoption of a charter by the electors of a municipality in the mode pointed out in the article.” (State, ex rel. City of Toledo, v. Lynch, Auditor, 88 Ohio St., 71.)
Now, how can this “immunity” be made practical and effective if the general assembly in the exercise of its police power through some board or .'commission, not chosen by the people, irresponsible to the people, and unreviewable by the people, may at any time nullify the action of the municipal government. This “immunity” thereupon becomes -an “-ideality,” and a very barren one at that. -- ■
-. Judge Shauck in the opinion, at-page 97, further speaks about the phrase “all powers of local self-government.” He says: “They are such powers of government as, in view of their nature and the field of their operation, are local and municipal in character. ’ The force- of the terms employed re-' quires the inclusion of such powers to be exercised *142 by officials who in some manner and to some extent represent the sovereignty of the people,”
Now, how can it be said that fares and rates to be paid by the city of Cleveland and its inhabitants are not “local and municipal in character?” How can it be said that the officials of the Public Utilities Commission of the state in any “manner and extent represent the sovereignty of the people?” Surely Judge Shauck will not be called a zealot or a bigot in behalf of the new order instituted under the amendments of 1912, but he was frank and wanted to be fair in the construction of this provision of the constitution.
In his concurring opinion in the Lynch case, Donahue, J., says, at page 108:
“That part of Section 3 with which we are particularly concerned reads as follows: ‘Municipalities shall have authority to exercise all powers of local self-government.’ Certainly there is nothing obscure or uncertain in this language. It is so plain, concise and unambiguous that it affords no ground for controversy and suggests no doubt as to its meaning.”
Continuing Judge Donahue says at page 112: *143 change, and this, I think, these amendments have accomplished. It would therefore follow that the provision of Section 2, authorizing the enactment of general laws for the government of cities and villages, and additional laws for the government of municipalities adopting the same, does not authorize the legislature to grant any powers to municipalities, or to expand the powers already granted by the people, or to fix any date or any condition precedent to the exercise of thes.e powers. The grant of. powers found in Section 3 is full, absolute and complete within itself.' Therein is granted authority to exercise all powers of local self-government, Nothing further remains to be granted, and no authority is lodged anywhere, except in the donors of the grant, to impose conditions or delay the exercise of the rights conferred.”
*142 “The fact remains that at the time of the adoption of this amendment municipalities were recognized as creatures of the state, possessing only such powers as the general assembly of the state chose to confer upon them; and it has been uniformly held, in Ohio at least, that municipalities had no power beyond the express powers granted to them by statute. It was this condition of affairs that this provision of the constitution intended to
*143 If now the grant of power as found in Section 3 is “full, absolute and complete within itself,” if such grant is “so plain, concise and unambiguous that it affords no ground for controversy and suggests no doubt as to its meaning,” then upon what principle of constitutional government are the cities of Ohio in their affairs of local self-goverm ment still subject to government by general as-, sembly, or still subject to government - by some board or commission created by the general assembly? .
Here is a square flat-footed contradiction. If the doctrine announced in the Lynch case was sounfl, then the doctrine announced in the Telephone-case was as undoubtedly, unsound. All the decisions of all the courts of Ohio agree that if the *144 general assembly of Ohio had delegated to the municipality the right to fix a rate for telephones, for street cars or for any public utility product or service, that the municipality thereby would be vested with such power.
If the general assembly could always have made such a grant of governmental power, by what kind of legal legerdemain can it now be held that the people of Ohio through the constitutional home-rule amendment could not by the most general terms, terms that were “clear,” and terms that were “full and absolute” when the Lynch case was decided, make such an equal grant of power?
As Donahue, J., well said in the Lynch case just quoted, “nothing further remains to be granted.” Why? Because the constitution made the “full” grant to the people of the cities and villages, and if the constitution made the “full” grant it is obvious there was nothing left for the general assembly to grant.
But this is not so much a question of a grant of power by the general assembly. By the construction of this court in this case the general assembly is. permitted under the constitution to absolutely destroy the grant made by the people of Ohio to the people of the municipalities.
Surely if under the constitutional provision there was “nothing” for the general assembly to grant to the people, there was clearly nothing for the general assembly to destroy in the powers directly granted by the constitution.
Johnson, J., in the case of Froelich v. The City of Cleveland, supra, said at page 389:
*145 “By specific grant from the people the municipality became clothed with part of the sovereign power of the state, that is, as said by Shauck, C. J., in the Lynch case, supra, such powers of government as in view of their nature and the field of their operation are local and municipal in character; There was entire agreement in that case that by the municipal home-rule amendment the people made a new distribution of sovereign governmental power.”
He further said at page 380 of above case:
“It was conceded that after the amendment the source of governmental authority, and the measure of its extent in municipalities which adopted charters, was the constitution itself; and that by the adoption of charters cities were authorized to secure immunity from general laws. The only question was as to the method of procedure.”
Many more opinions, might be cited to the same general effect. There are none to the contrary in Ohio’s reported cases.
These opinions are simple and straightforward in their declaration. I regret that they are not equally straightforward in their application to municipal affairs.
I concur most heartily in the self-evident proposition that appears in the first paragraph of the syllabus of the Telephone case, upon which the judgment in this case is founded. That syllabus reads:
“The regulation of rates for services rendered or commodity furnished by a public utility is an exercise of police power.”
*146 Of course it could not be anything else but police power; for what is police power? The supreme court of the United States has described if not defined it very often, and probably nowhere better than in the recent case of Sligh v. Kirkwood, Sheriff, 237 U. S., 52:
“At an early day it was held to embrace every law or statute which concerns the whole or any part of the people * * *. The police power, in its broadest sense, includes all legislation and almost every function of civil government.”
Now upon what principle or course of reasoning is it held that this police power must be exercised by the general assembly; that it cannot be exercised by the municipality ? Upon what principle of judicial construction is it now held that when the people wrote into their constitution, “Municipalities shall have authority to exercise all powers of local self-government,” this did not include the police power, the most important, the most vital, the most comprehensive of all governmental powers? Evidently the court in its majority opinion in the Telephone case felt obliged to make some showing as to why such police power was lodged in the general assembly over and above the police powers lodged in the municipality and accordingly made the following declaration of principles, as appears on page 362 of the opinion in the Telephone case:
“Police power, however, cannot be divided along these lines or any other lines. There is no such thing as municipal police power as distinguished from state police power. Such a proposition is too *147 absurd to require -argument to the contrary. Counsel make no such claim. Every court in Christendom since the establishment of civilized jurisprudence, without a single dissenting voice, has held that police power is a power that inheres only in the sovereign.”
This is strong, sweeping language. It goes to the very foundations of the judgment in this case. It is indeed the major premise upon which the conclusion in the case is founded.
It is an old truism that a conclusion is just as sound and no more so than the premises upon which it is based. I make bold to say that there is .contained in this language the most beautiful bouquet of Bourbon blunders, expressed and implied, that has ever been handed to the bench and bar of Ohio.
It never was true of America since the Declaration of Independence, and it has not been true in Europe save under the autocracy of Louis XIV.
Blunder No. 1: The court in its opinion failed to comprehend or at least consider the far-reaching scope of police power, as defined by the supreme court of the United States in the case above cited, Sligh v. Kirkwood.
If- it had recognized the comprehensive scope covered by this kind of power, it would not have fallen into the resulting blunders in that case, which culminated in the greatest blunder of all, the judgment.
Blunder No. 2: “Police power cannot be divided along these lines or any other lines,”
*148 The primary student in the American system of government knows that our whole theory of constitutional government is based on delegated powers, and when you delegate power you necessarily divide it. The fathers delegated a part of. their sovereign power to the nation, they delegated a part of their sovereign power to the states, and they reserved to themselves a part of that sovereign power. If this does not divide governmental power, including, of course, police power, I do not understand the use of the word “division.”
Blunder No. 3: “There is no such thing as municipal police, power as distinguished from state police power.”
Courts are constantly called upon, both state and federal, to distinguish between a federal police power and a state police power, and likewise between a state police power and a municipal police power. This is such a self-evident truth that the wonder is that such an absolutely fatal policy would be seriously announced in view of the present state of the law.
Blunder No. 4: “Such a proposition is too absurd to require argument to the contrary.”
In view of what has been said I leave it for bench and bar of Ohio to locate the absurdity.
Blunder No. 5: “Counsel make no such claim.”
But counsel did make such claim and made it again and again, both in brief and argument; but even if counsel did not make such claim the constitution itself makes the claim, the city of Cleveland makes the claim, and to say that there is no *149 such thing as municipal police power in this modern day, — well, it is hard to be patient or polite in the face of such a self-evident fallacy.
Blunder No. 6: After.these amazing propositions are stated the court says: “Every court in Christendom since the establishment of civilized, jurisprudence, without a single dissenting voice, has held that police power 'is a power that inheres only in the sovereign.”
Now, nobody ever doubted this last proposition; but the question is, Who is sovereign? This court has held that the general-assembly is sovereign. I have endeavored to maintain that the people of the state are sovereign, and that when through their delegates they met in the constitutional convention, and later at the polls and ratified the home-rule amendment, the sovereignty of the people was delegated so far as “local self-government” was concerned, so far as municipal affairs were concerned, to the municipalities of the state. Else what did they mean by the first half of Section 3, “Municipalities shall have authority to exercise all powers of local self-government.”
If Section 3, of Article XVIII, known as the “Home Rule Amendment,” was not intended to do that, then it is impossible to make language plain enough, patent enough, practical enough, that this court can understand it.
What this court has done is to take the tail end of'Section 3, which relates only to state affairs, that is. to matters of general interest throughout the state, not local to a municipality, and tie that tail around the head of Section 3 until they have *150 choked the life out of it; and by decree of this court there is nothing left under this construction to the words “municipalities shall have authority to exercise all powers of local self-government” except what the general assembly chooses to leave in them.
By the rules of law laid down by the supreme court of Ohio, the Constitution of Ohio, so far as it applies to home rule for municipalities, is put wholly under the guardianship of the general assembly. The people of Ohio are identically where they were before the home-rule amendment was adopted.
But the supreme court of the United States in a well-considered case has recognized this very division of police power in the very able opinion rendered by Justice Brewer in St. Louis v. Western Union Telegraph Co., 149 U. S., 465. Justice Brewer says, at page 467:
“The city of St. Louis occupies a unique position. It does not, like most cities, derive its powers by grant from the legislature, but it framed its own charter under express authority from the people of the State, given in the constitution.”
How this fits the experience of the city of Cleveland until the supreme court of Ohio spoke in absolute contradiction of Justice Brewer’s opinion. Justice Brewer continues.:
“And this charter is an organic act, so defined in the constitution, and is to be construed as organic acts are construed. The city is in a very just sense an ‘imperium in imperio/ Its powers are self-appointed, and the reserved control exist *151 ing in the general assembly does not take away this peculiar feature of its charter.”
If this doctrine does not recognize and respect divided police power between a state and a municipality I should like to know what language could be used so as to recognize divided police power.
That same division of police power was designed and declared in the Constitution of Ohio, and was there until this court under the mask of judicial construction took it out and destroyed it.
It is this very inability of this court to distinguish between federal police power, state police power, and municipal police power, that has led to this confusion touching the doctrine of home rule; has led to the absolute destruction of municipal home rule in all its vital functions.
Johnson, J., in his opinion in the Froelich case quotes this St. Louis case with very evident approval, and there is no indication whatsoever in the opinion that the judges who concurred with him in the judgment did not endorse or approve this view of the municipal power pertaining to the city of St. Louis, as quoted by Judge Johnson, and yet all the judges concurring in' the Froelich case have concurred in the very contrary doctrine announced in this Illuminating case.
In the St. Louis case the city was made the supreme power under its charter. The judge said it was “in a very just sense an 'imperium in imperio,’” that it got its grant “under express authority from the people of the State, given in the constitution," and not from the general assembly. *152 Clearly the same was.intended in the case oi Ohio cities and villages.
I regret that I cannot reconcile these contrary and repugnant positions taken by thei several members of this court.
The judgment in the Froelich case, with .the grounds announced for" sustaining it, calls for a judgment in this case exactly contrary to the one rendered.
This'court inserts after the provision, “Municipalities shall have authority to exercise all powers of local self-government,” the following words, in substance, “subject to general laws,” or “subject to the general assembly of Ohio,” or “subject to some board or commission created by such general assembly.”
This is the legal and logical effect of the Telephone case and of this case, and the people of Ohio will so understand' it.
True, the last part of Section 3, Article XVIII, does make the municipality, as a political subdivision of the state, the same as the township, or the county, amenable to a general state law that is uniform and state-wide in its operation, and it should be so; but when it comes to dealing with matters that are purely local and municipal in their character, wholly within the municipality and peculiar to the municipality, dealing with local conditions, local franchises, such is not a matter of state-wide importance; it is not a matter of a “general” nature; it is not a matter or question for “uniform” operation throughout the state, and was never intended to have such operation.
*153 When the people of Ohio amended their state constitution one of the primary, paramount purposes to be effected in the amendment was to give the people of Ohio the final word by referendum upon legislative acts, barring the few exceptions of an emergency nature mentioned in the constitution. The legislative body was' composed of three divisions, senate, house and the people, the latter reserving the right to veto. This right of referendum is stated and safeguarded again and again in the constitution. Indeed one cannot read the Constitution of 1912 without being persuaded again and again that it was the systematic studied effort of the people to check the arbitrary power of the general assembly and of our courts in the administration of the people’s government.
In addition to the referendum provided upon laws of a general nature the Constitution gave specifically to the people of the cities the right of referendum upon all “additional laws" affecting their government before they should become operative in the cities. This court nowhere has attempted to give meaning and motive power to this section and they dare not do so. It would call for reversal of judgment after judgment in this court upon the doctrine of home rule.
Under the policy pursued by this court all that is needed to destroy every vestige of home rule in Ohio is for the general assembly to enact some general comprehensive law and create some commission that will take out of the hands of the people of the cities, under the guise of police power, all their inherent and delegated sovereignty.
*154 Again, that right of referendum was given to the people of the city as to all ordinances save those of an emergency nature; in short, the people of Ohio in municipalities and out of them were to be protected, were to have the final word in regard to policies to be imposed upon them. And it was always presumed that even affecting street car fares, light, heat, and power charge, and telephone charge, and the like, provided by ordinance, the people had a right of referendum upon all such before any rate could be imposed upon them, even by their own council. But what right have they today under the autocratic commission rule that prevails in Ohio by decree of this court ?
Indeed the public utility corporations of Ohio 'have won a great victory in this decision. They are entitled to treat it with ghoulish glee. What they lost before the constitutional convention, what they lost at the polls when this amendment was adopted, they have more than won by the judgment of this court.
Nearly a century and a half ago there arose among the thirteen colonies, with their three million people, a great governmental issue, which they characterized in their Declaration of Independence as evincing “a design to reduce them under absolute despotism.” It was in popular phrase a protest against “.taxation without representation,” which was held to be “tyranny.” In pursuance of such policy George III and his ministers were collecting from his colonist subjects a sum of money, approximately 35,000 pounds annually, or less than $200,000, to most of which little objection was *155 made, except that it violated the primary and fundamental principles of the rights of Englishmen.
This, was not an enormous sum and assurances were repeatedly given that there would be partial reductions in order to satisfy local grievánces; bur in principle the Americans held it to be contrary to law and their constitutional right.. This solemn conviction was largely responsible for the declaration of principles drawn by Thomas Jefferson, who seems to have known somewhat of what democracy is. In that declaration of principles he spoke of governments “deriving their just powers from the consent of the governed.”
It is a long, long road between that kind of government of which Jefferson wrote and the kind of home-rule government we now have in Ohio under commission rule by decree of this court.
By the case at bar, rates, tolls, charges, fares, and- the like, which even under the old order, by favor of statutes of the general assembly, the cities usually regulated by franchise ordinances, today are fixed against the people of the cities and villages of Ohio by a state commission unchosen by the people, unrepresentative' of them, wholly unresponsible to them, and unreviewable by them; and this not only without their consent, but against their protest and in violation of the fundamental principles not only of our federal government, as expressed in its Declaration of Independence, but of the Ohio home-rule amendment o£ the Constitution of 1912.
*156 If the conduct of England toward the colonists in assessing a comparatively nominal sum for the support of the English government, without giving the American colonists the right to be heard, the right of representation, the right to any voice in the fixing of such sum, was tyranny, what shall be said of the modern-day policy of dealing with the people of the cities of Ohio in fixing-charges of millions and millions of dollars upon them without their consent, and contrary to the determination -of their local councils, which sums are fixed and assessed not by order of parliament as of old, but under the new order established by the supreme court of Ohio in permitting the general assembly so to do through its commissions at Columbus?
If the people of Ohio in 1912 did not give the people of the cities full police power, sufficient for successful local self-government, sufficient to conduct their own municipal affairs, as is now held by this supreme court, then I answer they gave them nothing but an ornamental gold brick.
I maintain, however, that the people of Ohio acted in good faith, used language adequately broad and sufficiently clear and conducive to the purpose to delegate to the people of the cities and villages of Ohio that full grant of police power necessary for the right of self-government in municipal affairs.
In the Telephone case, which was decided June 21, 1918, I used this language in my dissenting opinion, at page 427:
“Abroad we are fighting for democracy, to defend it for the' nation and the world. At home we *157 are fighting against democracy, to defeat it for the cities and villages of Ohio. I shall leave it for others to show the consistency between our position at home and abroad. If home rule be a good thing for Belgium, for Servia, for Bulgaria, Poland, Roumania and Ireland, it would seem by parity of principle that it ought to be a good thing under our constitution for Ohio’s cities and villages, and it was so intended.”
Since that language was used that war has been overwhelmingly decided in favor of democracy. Shall it now be said that democracy’s overwhelming victory amounted to nothing except for the peoples abroad; that the right of “self-determination” is a good thing, an inalienable right for foreign peoples, but not an inalienable right of the citizens of Ohio living in its municipalities ?
I may mistake the spirit of the people of Ohio cities and villages, but I do not believe they will be content to accept this counterfeit substitute for home rule for cities, through a state commission wholly unrepresentative of them -and unresponsible to them.
You might as well extract the juice from the orange and call the residue orange, -you might as well extract the blood from the man and call the residue man, as construe out of this constitution “municipal police power” and call the residue home rule.
No matter how lofty the personnel of the commission may be, the fundamental principle involved in that kind of government is undemocratic, unconstitutional and un-American.