Wanamaker, J.
The case was tried and determined below upon the sole theory that the village obtained all its municipal power from the statutes, and the question therefore was: Did the village have statutory power to prohibit the owners of such motor busses from doing business upon the streets of the village, in letting off and taking on passengers'?
1. The plaintiffs below denied that the statutes in question granted such power.
2. That if they did grant such power, such grant, in its exercise under this ordinance, was in violation of the Constitution, especially a portion of Section 19, Article I.
We will consider these two propositions in their inverse order. The part of Section 19, Article I of the Ohio Constitution, relied upon to protect the right of the motor busses to operate upon the streets of the village, is:
“Roads, which shall be open to the public, without charge. * * *”
Manifestly this language applies to ordinary and customary uses of public highways by the people, in their usual and ordinary methods of travel. *248 If cannot be held to apply to extraordinary methods of travel, involving special expense or hardship to the public by reason of unusual wear and tear of the streets, or special hazards to the public in such use, else all occupation and use of the streets for wires, conduits, pipes, rails and otherwise, upon which reasonable charges and regulations have been from time to time made by law, are likewise illegal and unconstitutional. Such a claim has never been considered in any of the reported opinions to which our attention has been called, and, in view of the many years of regulation of the use of the streets in behalf of the public, it would be rather late to invoke such a claim now. This contention is not tenable in reason or justice to the public. Such language could never have been intended to relate to a business purely commercial, conducted upon the streets of a municipality, which streets were opened, improved, and maintained at public expense, taxation, or assessment, to which such commercial user contributed not a penny.
The statutes considered by the courts below are Sections 3714 and 3632, General Code. Section 3714 provides:
“Municipal corporations shall have special power to regulate the use of the streets, to be exercised in the manner provided by law.”
Section 3632, among other things, provides:
“To regulate the use of carts, drays, wagons, hackney coaches, omnibuses, automobiles, and every description of carriages kept for hire or livery stable purposes; to license and regulate the use of the streets by persons who use vehicles, or solicit or transact business thereon,” etc.
*249 It should be noticed that the language of Section 3714 is “to regulate the use of the streets.” Now, it is claimed that this does not authorize council to exclude or prohibit the motor bus from the use of such streets. If the language of that section was to regulate motor busses, it might fairly be assumed that “to regulate” did not include to prohibit. But when the language of a statute is “special power to regulate the use of the streets,” it must be fairly assumed that that power is broad enough to contemplate that the streets may be used for some purposes, and denied for use for other purposes, so long as the classification has any reasonable basis, such as wear and tear of the streets, extra hazards, and the like.
Again, Section 3632 includes the words:
“To license and regulate the use of the streets by persons who use vehicles, or solicit or transact business thereon.”
The right to license persons who “solicit or transact business” on the streets clearly includes the right to refuse such license to certain classes of persons so operating upon the streets. A village might well contemplate that its merchants who own property in the municipality, and live in the municipality, contributing to its development and welfare and paying their taxes in the municipality, should not have as competitors upon its streets a line of street stores operated by motor busses. Therefore that which they believe to be in the interest of the village’s growth and development, the question of protecting their own local interests, might be regarded as primary and paramount to the village authorities.
*250 It would be difficult indeed to contend against any such legislation upon such grounds. The motive of the council in passing such legislation cannot be inquired into in this cause. The presumption is that its members acted in good faith, and therefore the naked allegation in the petition suggesting the contrary is not sufficient to warrant any consideration of this proposition.
Prior to 1912, all municipal power had been held by our courts to be by grant of the General Assembly. It was made in sections or segments by virtue of many statutes, the meaning and scope of them ofttimes being more or less uncertain and difficult. But in 1912 a new order was established with relation to municipal powers, by which the sovereign people of Ohio, through constitutional provisions (Section 3, Article XVIII), made a broad blanket grant of “all powers of local self-government’’ to all municipalities.
We are entirely aware that the case of State, ex rel. City of Toledo, v. Lynch, Auditor, 88 Ohio St., 71, 102 N. E., 670, 48 L. R. A. (N. S.), 720, Ann. Cas. 1918D, 949, squarely holds, in proposition 1 of the syllabus, that, before such powers of local self-government can be exercised by the municipality, such municipality must adopt a charter, and it would therefore be urged that the village of Perrysburg, not having adopted such charter, might in no wise contend for such constitutional grant of power as found in Article XVIII of the Constitution. The first reference to a municipal charter in the constitutional amendments adopted in 1912 is in Section 7, Article XVIII, which reads:
*251 “Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of Section 3 of this article, exercise thereunder all powers of local self-government.”
It should be here noted that the words in Section 7, “all powers of local self-government,” are identical with words forming a part of Section 3. In the Lynch case, supra, two of the judges, Judge Donahue and Judge Wanamaker, dissented from the first proposition of the syllabus; the latter dissenting from the judgment as well. Judge Donahue, touching this proposition of the syllabus, uses this pertinent and persuasive language, at page 113 of his concurring opinion in 88 Ohio St. (102 N. E., 678, 48 L. R. A. [N. S.], 720, Ann. Cas. 1918D, 949):
“Section 7 provides that any municipality may frame and adopt or amend a charter for its government, and may, subject to the provisions of Section 3 of this article, exercise thereunder all powers of local self-government. This section does not purport upon its face to control the operation of Section 3. On the contrary, it does purport upon its face that this must be done subject to the provisions of Section 3. In other words, it clearly appears, from the language used in Section 7, that Section 3 is the dominant section. Even if this did not appear, there is no language used in Section 7 that even suggests the necessity of a charter before the exercise of the powers conferred in Section 3. If the construction contended for by the respondent is to be given to this section, then it is necessary to read into it a mandatory provision that this charter must be adopted before municipalities can ex *252 ercise the powers of local self-government; that is to say, such a construction would require us to read this section as if it were written in the following language: ‘Before any municipality may exercise the powers of local self-government, it must frame and adopt or amend a charter for its government.’ ”
The holding of the court in the Lynch case, supra, is mere dictum, and there is absolutely nothing in the language of Section 7, or any other section of Article XVIII, that supports such a holding, and there has been no express reaffirmation of this doctrine since the decision of the Lynch case; but, to the contrary, many other cases have been decided wherein municipal power authorized by the Constitution has been recognized in the municipalities of Ohio which have not adopted a charter. To this effect, see the following: City of Fremont v. Keating, 96 Ohio St., 468, 118 N. E., 114, and Greenburg v. City of Cleveland, 98 Ohio St., 282, 120 N. E., 829. Other decisions are to the same general effect, and nowhere do we find this particular doctrine of the Lynch case in any wise reaffirmed.
The Court of Appeals of Mahoning county has reviewed this case, and has held in City of Youngstown v. Arnold, 15 Ohio App., 112, in the syllabus, as follows:
“2. Section 3, Article XVIII of the Constitution of Ohio, is self-executing.
“3. The doctrine of the first paragraph of the syllabus of State, ex rel. City of Toledo, v. Lynch, Auditor, 88 Ohio St., 71, has been impliedly overruled by subsequent opinions of the Supreme Court.”
*253 But what is a city charter hut a city constitution, and a city constitution can in no wise enlarge the municipal power granted in the state Constitution. -After all, it only distributes that power to the different agencies of government, and in that distribution may place such limitation, but not enlargement, upon that power, as the people of the municipality may see fit in such charter or constitution. The city charter in no wise affecting the degree of municipal power of the state Constitution, its optional adoption under the language of the Constitution should in no wise affect the operation of Section 3, Article XVIII, which by the constitutional schedule was to go into effect November 15,1912. Moreover, the language of Section 7 is merely “may” adopt a charter.
If this be the true doctrine, then it becomes necessary to examine the constitutional provision in question, together with some of the old landmarks of the law concerning political power:
“All political power is inherent in the people.”
This is the genesis of all American government. This identical language is in the Ohio Bill of Rights (Section 2, Article I), and in syllable or spirit it is found in all the state Constitutions. That “political power” not only resides in the people, but remains with them until they have delegated it to some department of their state government, or some subdivision thereof. The delegation of political power is either expressed or implied; but it must always be remembered that implied powers delegated must be such as are naturally or necessarily incidental or auxiliary to the express power, and, as such, the implied power cannot be in any wise de *254 structive of, or in conflict with, an express delegation of power.
Express delegations of political power are made through constitutional provisions, and are necessarily exclusive delegations of power, unless it be expressly provided otherwise. One of the earliest cases in Ohio dealing with this provision of our Bill of Rights is Cincinnati, Wilmington & Zanesville Rd. Co. v. Commrs. of Clinton County, 1 Ohio St., 77, in which, in a masterly opinion, Judge Ranney, at page 85, speaks as follows:
‘ ‘ They [the people] have, therefore, the most undoubted right to delegate just as much, or just as little, of this political power with which they are invested as they see proper, and to such agents or departments of government as they see fit to designate. To the Constitution we must look for the manner and extent of this delegation; and from that instrument alone must every department of the government derive its authority to exercise any portion of political power.”
In the following year the Ohio Supreme Court, speaking through another equally eminent jurist, Judge Thurman, in Cass v. Dillon, 2 Ohio St., '607, used this language, at page 616, touching the delegation of political power:
“That the powers of the subdivisions, as well as of the state herself, are derived from the Constitution, is undoubtedly true. But equally true is it that it was competent for the people to confer upon the one powers not conferred upon the other; and there is nothing in the least degree irrational in supposing a grant of power to a subdivision that is withheld from the state at large.”
*255 Prior to 1912 there was no express delegation of power to municipalities in the Ohio Constitution. Under the decisions of our courts, it had been held again and again, Ravenna v. Pennsylvania Co., 45 Ohio St., 118, 12 N. E., 445, being especially in point, that municipal power was delegated only by virtue of a statute. Therefore municipalities of the state, especially the larger ones, were continually at the door of -Ohio’s General Assembly asking for additional political power for municipalities, or modifications in some form of previous delegations of such power. Such power, being legislative only, could be withdrawn from the municipalities, or amended, at any session of the Legislature.
Municipalities were, therefore, largely a political football for each succeeding Legislature, and there was neither stability of law, touching municipal power, nor sufficient elasticity of law to meet changed and changing municipal conditions. To the sovereign people of Ohio the municipalities appealed in the constitutional convention of 1912, and the Eighteenth Amendment, then known as the “Home Rule” Amendment, was for the first time adopted as a part of the Constitution of Ohio, wherein the sovereign people of the state expressly delegated to the sovereign people of the municipalities of the state full and complete political power in all matters of “local self-government.”
It would be a bold assertion to sa,y that “all powers of local self-government,” as used in the Ohio Constitution of 1912, did not include the power of complete regulation and control of the streets. The streets and alleys of a. muricipality are what the arteries and veins are to a man. Control must be *256 placed somewhere, and, if there is any virtue whatsoever in democracy, why should not that control be placed in the community which opens the streets, pays for their establishment, their maintenance, and best understands their needs for durability and safety?
In considering the powers of municipalities, under a Constitution less favorable to home rule than the Ohio Constitution, to-wit, the Missouri Constitution, the Supreme Court of the United States, in St. Louis v. Western Union Telegraph Co., 149 U. S., 465, 13 Sup. Ct., 990, 37 L. Ed., 810, a comparatively early case, laid down some sound doctrine touching the city of St. Louis, under its charter, which was by less favorable constitutional grant. Judge Brewer, speaking for the court, said at page 467 of 149 U. S., at page 991 of 13 Sup. Ct (37 L. Ed., 810):
“In the opinion heretofore announced it was said: ‘We do not understand it to be questioned by counsel for the defendant that, under the Constitution and laws of Missouri, the city of St. Louis has the full control of its streets in this respect and represents the public in relation thereto.’ ' * * * We see no reason to change the views expressed as to the power of the city of St. Louis in this mattér. Control over the streets resides somewhere. As the legislative power of a state is vested in the Legislature, generally that body has the supreme control, and it delegates to municipal corporations such measure thereof as it deems best. The city of St. Louis occupies a unique position. It does not, like most cities, derive its powers by grant from the Legislature, but it framed its own charter under *257 express authority from the people of the state, given in the Constitution. * * * And this charter is an organic act, so defined in the Constitution, and is to be construed as organic acts are construed. The city is in a very just sense an ‘imperium in ‘imperio.’ ”
This doctrine of local sovereignty in local affairs was perhaps no better put than by Abraham Lincoln in 1859 in an address from the statehouse front at Columbus, Ohio. Discussing the Douglas doctrine of political sovereignty, Lincoln said:
“I believe there is a genuine popular sovereignty. I think a definition of ‘genuine popular sovereignty,’ in the abstract, would be about this: That each man shall do precisely as he pleases with himself, and with all those things which exclusively concern him. Applied to government, this principle would be that a. general government shall do all those things whieh pertain to it, and all the local governments shall do precisely as they please in respect to those matters which exclusively concern them. I understand that this government of the United States, under which we live, is based upon this principle; and I am misunderstood if it is supposed that I have any war to make upon that principle.”
It has always been recognized, before 1912 as well as after, that matters relating to all local improve ments, such as roads, streets, ditches, and the like, have been peculiarly matters of local concern and control. One of the latest cases passed on by this court is that of Allion v. City of Toledo, 99 Ohio St., 416, 124 N. E., 237, 6 A. L. R., 426. The syllabus reads:
*258 “1. Unless there is a clear and palpable abuse of power, a court will not substitute its judgment for legislative discretion. Local authorities are presumed to be familiar with local conditions and to know the needs of the community.
“2. A city ordinance, fixing standard sizes of bread loaves and prescribing loaves of one pound avoirdupois as the minimum weight that may be manufactured and sold by a baker, is not an unreasonable or arbitrary exercise of police power and is constitutionally valid.”
In the opinion of that case by Judge Jones, 99 Ohio St., 420, 124 N. E., 238 (6 A. L. R., 426), the case of Schmidinger v. Chicago, 226 U. S., 578, 33 Sup. Ct., 182, 57 L. Ed., 364, Ann. Cas. 1914B, 284, is cited and quoted with approval. The doctrine there laid down is as follows:
“Local legislative authorities, and not the courts, are primarily the judges of the necessities of local situations calling for police regulation, and the courts can only interfere when such regulation arbitrarily exceeds a reasonable exercise of authority.”
But what distinction can be drawn in principle between an interurban railroad run by electric power and a motor bus line run by gasoline? It would not be seriously contended that the municipality might not withhold from an interurban street car company the right to use its streets for such transportation agencies, passenger or freight, or both; how can it be contended that the municipality has not the right to likewise withhold the privilege of a motor bus company to transport its cars over said highways for purposes equally commercial? Both are public utilities. Ordinarily the interurban line *259 is confined to only a portion of the street. It may be a side of the street little used, if at all, by the general public; while the motor bus line uses the entire street. We see no difference in principle between the right to control the one and the right to control the other. If there is a right to control one, there must be an equal right to control the other by either license or a refusal to license. There is no discrimination here between the rights of the people within the village and the people without the village. We are not passing upon the question whether or not the municipality saw fit to interfere with through traffic over its streets by entirely prohibiting the same. That question is not here.
It must be remembered that the question to this court is not one of municipal policy. It is simply one of municipal power. The wisdom or unwisdom of the policy is for the municipality’s determination. The question of municipal power is properly a judicial question, as to which we hold that the municipality acted within the constitutional power conferred.

Judgment reversed.

Marshall, C. J., Day and Allen, JJ., concur.
Robinson, Jones and Matthias, JJ., dissent.